Mark Frankel
Backenroth Frankel & Krinsky, LLP
800 Third Avenue, Floor 11
New York, New York  10022
(212) 593-1100
mfrankel@bfklaw.com

Jeffrey Fleischmann, Esq.
Law Office of Jeffrey Fleischmann PC
150 Broadway, Suite 900
New York, N.Y. 10038
Tel. (646) 657-9623
Fax (646) 351-0694
jf@lawjf.com

*Attorney for Defendants 152 Broadway*
*Haverstraw NY LLC, Blue Beverage Group, Inc.,*
*Joseph Goldberger, Toby Weinberger, MFT Holdings LLC,*
*Estate of Jeno Guttman, and Ryvkie Goldberger*

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

In re:                                                    Chapter 11

BROADWAY EQUITY HOLDINGS LLC,                Case No. 17-22242 (RDD)

                                 Debtor.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X
BROADWAY EQUITY HOLDINGS LLC,

                                                   Adversary Case No. 17-8215 (RDD)
                                 Plaintiff,

        - against -

152 BROADWAY HAVERSTRAW LLC,                    **ANSWER AND**
BLUE BEVERAGE GROUP, INC., JOSEPH              **COUNTERCLAIMS**
GOLDBERGER, TOBY WEINBERGER, MFT
HOLDINGS LLC, ESTATE OF JENO GUTTMAN,
RYVKIE GOLDBERGER, VILLAGE OF
HAVERSTRAW RECEIVER OF TAXES,
COMMISSIONER OF FINANCIE OF THE
COUNTY OF ROCKLAND, NEW YORK STATE
DEPARTMENT OF TAXATION AND FINANCE,
"JOHN DOES NO. 1" through "JOHN DOE NO. 10",
and said names being fictitious, it being the intention
of Plaintiff to designate all persons, partnerships,

corporations, or other entities in possession of the
premises as tenant or otherwise any/or all persons
or entities having or claiming an interest in
said premises,

                                    Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

BLUE BEVERAGE GROUP, INC., JOSEPH
GOLDBERGER and JOSEPH MENCZER,

                         Counterclaim Plaintiffs,

             - against –

BROADWAY EQUITY HOLDINGS LLC,
JOEL WERTZBERGER a/k/a JOEL
WURTZBERGER, ARON WOLCOWITZ
a/k/a ARON JACOB WOLKOWITZ a/k/a
JACK WALKOWITZ and JUDY MINSTER,

                         Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

        Defendants 152 Broadway Haverstraw NY LLC ("152 Broadway"), Blue Beverage

Group, Inc. ("Blue Beverage"), Joseph Goldberger ("Goldberger"), Toby Weinberger

("Weinberger"), MFT Holdings LLC ("MFT"), Estate of Jeno Guttman ("Guttman Estate"), and

Ryvkie Goldberger ("Ryvkie")(collectively "defendants"), by their undersigned counsel, deny

the material allegations of the Amended Complaint (the "Complaint") of plaintiff Broadway

Equity Holdings LLC ("Broadway Equity), and answer as follows:

## **THE PARTIES**

        1.      State that they are without knowledge or information sufficient to form a belief as

to the truth of the allegations set forth in paragraph "1" of the Complaint.

        2.      152 Broadway and Goldberger admit the allegations set forth in paragraph "2" of

the Complaint.   The remaining defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph "2" of the Complaint.

3.      Goldberger and 152 Broadway admit that Goldberger was and is a member of 152

Broadway and deny knowledge or information respecting the meaning and definition of the

phrase "financial interest."  The remaining defendants deny knowledge or information sufficient

to form a belief as to the truth of the allegations set forth in paragraph "3" of the Complaint.

4.      Blue Beverage and Goldberger admit the allegations set forth in paragraph "4" of

the Complaint.   The remaining defendants deny knowledge or information sufficient to form a

belief as to the truth of the allegations set forth in paragraph "4" of the Complaint.

5.      Goldberger and Blue Beverage admit that Goldberger was and is an officer and

shareholder of Blue Beverage.  The remaining defendants deny knowledge or information

sufficient to form a belief as to the truth of the allegations set forth in paragraph "5" of the

Complaint.

6.      Goldberger admits the allegations set forth in paragraph "6" of the Complaint.

The remaining defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph "6" of the Complaint.

7.      Weinberger admits the allegations set forth in paragraph "7" of the Complaint.

The remaining defendants deny knowledge or information sufficient to form a belief as to the

truth of the allegations set forth in paragraph "7" of the Complaint.

8.      MFT admits the allegations set forth in paragraph "8" of the Complaint.   The

remaining defendants deny knowledge or information sufficient to form a belief as to the truth of

the allegations set forth in paragraph "8" of the Complaint.

9.      Defendants admit the allegations set forth in paragraph "9" of the Complaint

except all defendants except Guttman deny knowledge or information regarding the residency or

date of death of Guttman.

10.     Ryvkie admits the allegations set forth in paragraph "10" of the Complaint.   The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "10" of the Complaint.

11.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "11" of the Complaint.

12.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "12" of the Complaint.

13.     As the Complaint does not contain a paragraph "13" a response is not required.

14.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "14" of the Complaint.

15.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "15" of the Complaint.

## JURISDICTION AND VENUE

16.     The allegations set forth in paragraph "16" of the Complaint are statements of jurisdiction or conclusions of law to which no response is required.  To the extent this paragraph contains factual contentions, they are denied.

17.     The allegations set forth in paragraph "17" of the Complaint are statements of jurisdiction or conclusions of law to which no response is required.  To the extent this paragraph contains factual contentions, they are denied.

18.     As paragraph "18" of the Complaint does not assert an affirmative allegation against any defendant, a response is not required.

## FACTUAL ALLEGATIONS

### A.    The Property

19.    Admit the allegations set forth in paragraph "19" of the Complaint and refer the Court to the Complaint and **Exhibit A** annexed thereto for a full and complete description of the Property.

20.    Goldberger and 152 Broadway admit the allegations contained in paragraph 20 of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "20" of the Complaint.

21.    Regarding paragraph "21" of the Complaint, Goldberger, Blue Beverage and 152 Broadway admit that a bottling plant has been operated at the Property.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "21" of the Complaint.

22.    Goldberger, Blue Beverage and 152 Broadway admit the allegations contained in paragraph "22" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "22" of the Complaint.

### B.    The $6,000,000 Promissory Note and Mortgage

23.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "23" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "23" of the Complaint.

24.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "24" of the Complaint.  The remaining defendants deny knowledge or information

sufficient to form a belief as to the truth of the allegations set forth in paragraph "24" of the Complaint.

26.     Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "25" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "25" of the Complaint.

26.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "26" of the Complaint.

27.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "27" of the Complaint.

28.     Goldberger and 152 Broadway deny the allegations contained in paragraph "28" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "28" of the Complaint.

29.     Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "29" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "29" of the Complaint.

30.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "30" of the Complaint.

31.     Goldberger and 152 Broadway deny the allegations contained in paragraph "31" of the Complaint as the purported mortgage was never given to plaintiff.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "31" of the Complaint.

32.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "32" of the Complaint.

**C.     The Borrowers' Default and Subsequent Fraudulent Conduct with the Sham Judgment Creditors**

33.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "33" of the Complaint and refer the Court to the letter annexed to the Complaint as **<u>Exhibit D</u>** for its contents.

34.     Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "34" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "34" of the Complaint.

35.     Deny the allegations contained in paragraph "35" of the Complaint except so much thereof as alleges that each of Weinberger, Guttman, MFT, and Ryfkie is separately a judgment creditor of 152 Broadway and Blue Beverage.

36.     Regarding paragraph "36" of the Complaint, 152 Broadway and Goldberger admit that 152 Broadway executed a document identified as a "correction mortgage" that was recorded in the Rockland County Clerk's office.  The remaining allegations are denied except so much thereof as alleges that the separate judgments were filed in Kings County and recorded in the Rockland County Clerk's office.

37.      Goldberger and 152 Broadway admit that Goldberger affixed his signature to the "correction mortgage" and deny the remaining allegations contained in paragraph "37" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "37" of the Complaint.

38.     Goldberger and 152 Broadway admit that there is a handwritten note on the first page of the "correction mortgage" (and refer the Court "correction mortgage" for its contents) and deny the remaining allegations contained in paragraph "38" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "38" of the Complaint.

39.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "39" of the Complaint.

40.     The referenced document speaks for itself, and defendants deny allegations in paragraph "40" that are inconsistent with that document.

41.     Goldberger and 152 Broadway deny the allegations contained in paragraph "41" of the Complaint and refer the Court to the "correction mortgage" for its contents.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "41" of the Complaint.

42.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "42" of the Complaint.

43.     Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "43" of the Complaint.

44.     Goldberger and 152 Broadway admit that 152 Broadway caused Land Track Title Company LLC to file the "correction mortgage" for recording in the Rockland County Clerk's office and deny the remaining allegations contained in paragraph "44" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "44" of the Complaint.

45.    Deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "45" of the Complaint.

46.    Deny the allegations contained in paragraph "46" of the Complaint.

47.    Goldberger and 152 Broadway deny the allegations contained in paragraph "47" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "47" of the Complaint.

48.    Deny the allegations contained in paragraph "48" of the Complaint.

### FIRST CAUSE OF ACTION
(Foreclosure against the Borrowers)

49.    Defendants repeat and reallege their responses to all previous paragraphs above as if fully set forth herein at length.

50.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "50" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "50" of the Complaint.

51.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "51" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "51" of the Complaint.

52.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "52" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "52" of the Complaint.

53.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "53" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "53" of the Complaint.

54.    Deny the allegations contained in paragraph "54" of the Complaint except admit that defendants have in interest or lien in the Property.

55.    Goldberger, 152 Broadway and Blue Beverage deny the allegations contained in paragraph "55" of the Complaint.  The remaining defendants deny knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph "55" of the Complaint.

## SECOND COUNTERCLAIM
(Declaratory Judgment against the Borrowers and the Sham Judgment Creditors)

56.    Defendants repeat and reallege their responses to all previous paragraphs above as if fully set forth herein at length.

57.    The allegations set forth in paragraph "57" of the Complaint are conclusions of law to which no response is required.  To the extent this paragraph contains factual contentions, they are denied.

58.    The allegations set forth in paragraph "58" of the Complaint are conclusions of law to which no response is required.  To the extent this paragraph contains factual contentions, they are denied.

59.    Deny the allegations contained in paragraph "59" of the Complaint.

60.    The allegations set forth in paragraph "60" of the Complaint are conclusions of law to which no response is required.  To the extent this paragraph contains factual contentions, they are denied.

61.     Deny the allegations set forth in paragraph "61" of the Complaint.

## FIRST AFFIRMATIVE DEFENSE

62.     The Complaint does not set forth a cause of action against defendants upon which relief may be granted.

## SECOND AFFIRMATIVE DEFENSE

63.     The purported Mortgage and Note are fraudulent, were never agreed to by Goldberger, 152 Broadway and Blue Beverage, and the signatories forged.

## THIRD AFFIRMATIVE DEFENSE

64.     The plaintiffs' claims are barred by the doctrine of unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

65.     Plaintiff's damages, if any, were caused by its own culpable conduct and did not result from any act, omission or conduct of any defendant.

## FIFTH AFFIRMATIVE DEFENSE

66.      Plaintiff's claims are barred or resolved in defendant's favor based on documentary evidence.

## SIXTH AFFIRMATIVE DEFENSE

67.     The plaintiffs' claims are barred by the doctrine of estoppel.

## SEVENTH AFFIRMATIVE DEFENSE

68.     The plaintiff's claims are barred by the doctrine of illegality.

## EIGHTH AFFIRMATIVE DEFENSE

69.     The claims are barred by the statute of frauds.

## PRAYER FOR RELIEF

WHEREFORE, defendants demand judgment as follows:

(a) Dismissing the Amended Complaint in its entirety with prejudice;

(b) Awarding defendants their costs and expenses incurred in this action, including, but

not limited to, their reasonable attorneys' fees; and

(c) Granting defendants such other and further relief as the Court deems just and proper.

## COUNTERCLAIMS

Defendants-counterclaim plaintiffs Blue Beverage Group, Inc. ("Blue Beverage") and

Joseph Goldberger ("Goldberger"), and counterclaim-plaintiff Joseph Menczer

("Menczer")(collectively, the "counterclaim-plaintiffs"), by their undersigned counsel, for their

counterclaims against plaintiff-counterclaim defendant Broadway Equity Holdings LLC

("Broadway Equity) and counterclaim defendants Joel Wertzberger a/k/a Joel Wurtzberger

("Wertzberger"), Aron Wolcowitz a/k/a Aron Jacob Wolkowitz a/k/a Jack Walkowitz

("Wolcowitz") and Judy Minster ("Minster")(collectively, the "counterclaim-defendants"),

allege as follows:

## PRELIMINARY STATEMENT

1.      The underlying mortgage foreclosure proceeding brought by Broadway Equity is

a complete and absolute fraud.  Neither the Note nor the mortgage upon which Broadway Equity

relies was ever agreed to by defendants and what might appear to be their signatures on those

writings was forged by or on behalf of Wertzberger and Wolcowitz, the latter of whom

fraudulently notarized both of those documents.

2.      Broadway Equity, whose formation was arranged by Wertzberger and Wolcowitz

but identifies Minster as the sole managing member, never "loaned" six-million dollars or any

other sum of money to Blue Beverage, Goldberger or anyone else interested in this action.

Rather, as described more fully herein, in December 2012 Wertzberger and Wolcowitz entered into a contract with Goldberger and Menczer, pursuant to which they were to, and did, invest at least $5,000,000 into Blue Beverage, and to manage the day-to-day operations of Blue Beverage, with an option to ultimately purchase the company.

3.     The contract made no guarantees and, as a result, if Blue Beverage ultimately did not succeed as a business, there was no right to the reimbursement of monies invested by Wertzberger and/or Wolcowitz.

4.     After misrepresenting a breadth of experience in operating companies like Blue Beverage, and taking control of its day-to-day operations and management, in less than three (3) years, Wertzberger and Wolcowitz ran Blue Beverage into the ground.

5.     Today, Blue Beverage is no longer operational.  Thus, Wertzberger and Wolcowitz are not entitled to the return of any portion of their investment into the company.

6.     It is under this background that Wertzberger and Wolkowitz, desiring full reimbursement yet knowing that they caused the loss of their own investment, formed Broadway Equity as a means to create and file the false mortgage, while also using the entity in an attempt to shield themselves from personal liability.

7.     Their removal of the foreclosure proceeding to this Court under the guise of requiring bankruptcy protection further advances their attempted fraud, both on Blue Beverage (and its owners) and this Court.

8.     As described more fully herein, as a result of their incompetence in the management of Blue Beverage and other wrongful activities, Wertzberger and Wolcowitz breached their contract with Goldberger and Menczer, the result of which caused the demise of

Blue Beverage, including the loss of the more than $20 million invested into the company by Goldberger and Menczer.

9.      In short, both this fraudulent foreclosure proceeding and Broadway Equity's attempt to obtain relief and protection under the federal bankruptcy laws are entirely pre-textual. Wertzberger and Wolcowitz were fully aware that their breaches and other wrongdoing subject them to significant financial liability, so they simply conjured the fraudulent mortgage and ran to court hoping to extract monies to which they are not entitled from Goldberger and the other defendants.

10.     Their knowing fraud on this Court should not be countenanced.

**THE PARTIES**

11.     Blue Beverage is a corporation organized and existing under the laws of the State of New York and maintains its principal place of business at 152 Broadway, Haverstraw, New York  10927.

12.     Goldberger is a resident of the State of New York, County of Kings.

13.     Menczer is a resident of the State of New York, County of Kings.

14.     Upon information and belief, Broadway Equity is a limited liability company organized and existing under the laws of the State of New York with a mailing address in the State of New York, County of Kings.

15.     Upon information and belief, Wertzberger is a resident of the State of New York, County of Kings.

16.     Upon information and belief, Wolcowitz is a resident of the State of New York, County of Kings.

17.     Upon information and belief, Minster is a resident of the State of New York, County of Kings, is the wife of Wolcowitz and is the managing member of Broadway Equity.

## JURISDICTION AND VENUE

18.     This Court has subject matter jurisdiction over the counterclaims pursuant to 28 U.S.C. § 1334 and by virtue of the removal of the underlying state court foreclosure action to this Court having been approved by this Court.

19.     Venue is properly founded in the Southern District of New York pursuant to 28 U.S.C. § 1391(a) (2) and (b)(2) and by virtue of the removal of the underlying state court foreclosure action to this Court having been approved by this Court.

## FACTS COMMON TO ALL THIRD-PARTY CLAIMS

## BACKGROUND

20.     Having commenced operations in 2011, Blue Beverage conducted business as a private label bottler, supplier and co-pack manufacturer of what are known as "post-closure retort processing" products.  The post-closure technology of Blue Beverage's processing machines were designed to ensure a swift, trouble-free stabilization process for a variety of products, including, but not limited to, dairy based beverages, nutritional beverages, protein-based beverages, coffee, energy drinks, chocolate drinks, and low-acid sauces.

21.     After its founding, Blue Beverage quickly established a strong reputation in its industry, garnering critical acclaim for its bottling and retort applications, as well as for the products that it bottled and sent out into the marketplace.  Boasting a reputation as one of the few full-service plants in North America utilizing modern retort technology, Blue Beverage accommodated the needs of customers who sought shelf-stable products and multiple bottling options.

22.     Its modern 280,000 sq. ft. manufacturing facility was capable of filling up to 400 glass, aluminum or plastic containers per minute and was strategically and centrally-located in the lower Mid-Hudson Valley near all major shipping centers and two-thirds of the population of the United States.

23.     The products bottled and packaged by Blue Beverage included well-known premium brands that are sold by popular retailers and national distributors, including, but not limited to, Monster Energy Drinks and Ensure.

**The Contract**

24.     In or about 2012, Wertzberger and Wolcowitz were introduced to Goldberger and Menczer to discuss the former's potential investment in Blue Beverage, which needed additional capital to improve its operations.

25.     Wertzberger touted his vast experience running multiple businesses, including those involving the manufacturing and packaging of food products, and insisted that he had the requisite experience and "know-how" to operate an already successful Blue Beverage more efficiently in order exponentially to increase profitability.

26.     After some discussions, Wertzberger and Wolcowitz informed Goldberger and Menczer that they desired to invest money into Blue Beverage and manage its day-to-day operations, and to do so with the option of ultimately acquiring the company.

27.     Thereafter, Wertzberger and Wolcowitz (the "Buyers"), on the one hand, and Goldberger and Menczer (the "Sellers"), on the other hand, entered into a Commitment to Sell Contract dated December 26, 2012 (the "contract"). The contract identifies the Sellers as "Party A" and the Buyers as "Party B."

28.     Although denominated as a "Commitment to Sell" Blue Beverage to Wertzberger and Wolcowitz, in fact, the contract is one where the initial obligations of Wertzberger and Wolcowitz were to invest monies into the company and to perform all management functions on its behalf.  At all times relevant, the contract merely gave Wertzberger and Wolcowitz the option to buy the company from the Sellers (either in whole or in part).

29.     The ultimate sale of the sale of the company to them was conditioned on a number of factors, including, but not limited to, the total sum of monies invested by them.

30.     Under the contract, in the event that the sale of Blue Beverage to Wertzberger and Wolcowitz was consummated, their purchase would include all of the Blue Beverage's customers and contractors; all equipment and tools owned by the company; the entire real property located at the address of 152 Broadway, Haverstraw, New York; and the buildings then situated on the property and owned by Blue Beverage, including vacant buildings that served as storage space.

31.     The contract contains an acknowledgment that Goldberger and Menczer had already invested $21.5 million dollars into the company and separately taken out a mortgage in the sum of $6 million that Blue Beverage was still repaying.

32.     With this information, the contract set a purchase price of twenty percent (20%) of the entire principal investment of the Sellers, which approximated $5,000,000.

33.     In addition to the $5,000,000 purchase price, as part of their purchase, the Buyers agreed to accept all liens stemming from the company's outstanding debt "invested in the firm" as well as an existing mortgage.

34.     According to the contract, the sale would be complete upon delivery by the Buyers sixty percent (60%) of the agreed purchase price, at which time full possession of Blue

Beverage and its assets would be transferred to them.  The forty percent (40%) balance of the purchase price was to be imposed as an Isska debt against the Buyers payable within four (4) years of the contract date, with a "compromise fee" of eight percent (8%) per annum.

35.     As Jewish law generally prohibits the charging and payment of interest, an Isska debt is a transaction under Jewish law that permits the imposition of a payment that serves the same function as interest.

36.     If, after two (2) years from the date of the contract, the Buyers failed to pay sixty percent (60%) of the purchase price as required, the commitment would automatically expire the following day, thereby entitling the Sellers to sell the company, or any share thereof, to any third party and to reimburse the Buyers all funds invested by them interest free.

37.     Notwithstanding the foregoing, the contract also contains provisions regarding circumstances under which the Buyers could decide against purchasing the entirety of Blue Beverage under the above-referenced terms.

38.     For example, under the contract, the Buyers could decide to purchase only fifty percent (50%) of Blue Beverage and, under such circumstances, the Sellers would maintain their ownership interest in equal proportion to that of the Buyers.

39.     Under such circumstances, the contract provides for a proportionate reduction in the Buyers' acquisition cost for their share of the company.

40.     Regardless of whether or not the purchase transaction would ultimately be consummated, the contract required that the Buyers pay the broker who introduced them to Goldberger and Mintzer (identified therein as Mrs. Schwartz) the sum of $3 million from their respective personal funds with no contribution required by the Sellers.

**The Management Responsibilities of Wertzberger and Wolcowitz**

41.     In accordance with the contract, immediately upon its execution, Wertzberger and Wolcowitz were to and did start working as the sole managers of Blue Beverage.

42.     They collectively became immediately and fully responsible for the day-to-day operations of the company, including, but not limited to, the supervision of all employees and ensuring that each performed all of his or her duties; regular visits to the bottling plant in order to supervise and manage operations first hand; ensuring the maintenance of all equipment or the replacement of defective equipment; and hiring and supervising a plant manager.

43.     In addition, Wertzberger and Wolcowitz became responsible for the company's banking, including signing and depositing checks; arranging for effective advertising of the company's quality and benefits; marketing the company to new customers and clients (which they had previously represented to be amongst their most valuable attributes); accepting orders from clients and ensuring that clients timely received their orders; ensuring that employees provided optimal customer service; tracking the time worked by employees and ensuring the timely payment of wages; timely paying all utility bills and other company expenses; ensuring the timely collection of monies owed by customers and clients; and hiring an outside professional to provide regular accounting of the company's income and expenses.

44.     Under the foregoing arrangement, Wertzberger and Wolcowitz were to collectively work on behalf of Blue Beverage for not less than forty (40) hours per week.

45.     The contract also provides that, from the date of the contract until the date that the company's purchase by the Buyers was to be completed, Wertzberger and Wolcowitz would be responsible for funding all costs and expenses required to operate the company up to the sum of $4.8 million, including, but not limited to, using such funds to pay employees' wages, taxes, insurance, and to order bottles and labels.

46.    To the extent that additional monies would be needed within two (2) years of the contract, Wertzberger and Wolcowitz were also contractually authorized to obtain a loan from a bank or a private lender.

**The Managers' Obligations to Goldberger and Menczer**

47.    Even though the contract gave Wertzberger and Wolcowitz full reign over the management of Blue Beverage, the contract provides that they were not to conceal from Goldberger and Menczer anything taking place at the company.

48.    To the contrary, Wertzberger and Wolcowitz were contractually mandated to send Goldberger and Menczer a weekly email report detailing the company's weekly expenses and to send a detailed report three (3) times a year detailing any advances and improvements experienced by the company.

49.    Additionally, in the event that Wertzberger and Wolcowitz desired to reduce a client's purchase price for product by more than twenty percent (20%), notice to and the prior approval of Goldberger and Menczer was required (although the latter's silence after notice could be construed as their consent).

50.    Similarly, all decisions by Wertzberger and Wolcowitz to hire new employees, fire existing employees, or raise an employee's wages, and any decision to incur an expense or make an investment of more than $20,000, required the consent Goldberger and Menczer.

51.    The parties to the contract all agreed that, in the event of any disagreement regarding the day-to-day management of Blue Beverage, they would seek the assistance of an "agent" identified therein as Benzion Goldberger, who would work with all parties to resolve the dispute.

52.    In the event that any disagreement or dispute between the parties could not be resolved amongst themselves by working with Benzion Goldberger, the contract mandates that the disagreement/dispute be submitted to a Rabbinical Court for arbitration.

53.    Furthermore, in the event that Blue Beverage ceased operations for any reason, the contract provides that each owner or investor is responsible only for his own interest and is not to be responsible for the interest of the others.

54.    This means that no owner or investor of Blue Beverage can be owed any money by any other owner or investor of the company if everything is lost.

55.    However, in the event that Blue Beverage ceased doing business or otherwise became defunct, and some assets still remained, then each owner/investor would be entitled to a share of the assets proportionate to his respective investment.

**<u>Wertzberger and Wolcowitz Destroy Blue Beverage and Depart the Company</u>**

56.    Even though they invested more than $5,000,000 into the company, at no time did Wertzberger and Wolcowitz formally exercise their option to obtain either a full or partial ownership interest in Blue Beverage.

57.    Instead, in or about September of 2014, less than two (2) years after convincing Blue Beverage's shareholders that they had the requisite management skills to operate the company and would exponentially increase profits, Wertzberger and Wolkowitz informed Goldberger and Menczer that they were permanently leaving the company.

58.    At the time, Blue Beverage was on a downward spiral, having experienced continued losses in the two (2) years since Wertzberger and Wolkowitz had joined the company.

59.     Under the contract, upon relinquishing and terminating their management duties, Wertzberger and Wolcowitz remained obligated to continue funding the necessary operations of Blue Beverage for a full ninety (90) days thereafter.

60.     In breach of the contract, they failed and refused to do so.

**Other Breaches and Wrongful Activities of Wertzberger and Wolcowitz**

61.     From the moment that they took over the management of Blue Beverage, it became clear that neither Wertzberger nor Wolcowitz had the background or requisite experience to operate the company.

62.     Even though Wertzberger represented that both he and Wolcowitz had full understanding of the vagaries of operating a bottling company, in fact, they had no prior experience at all.

63.     This lack of experience became increasingly evident from the date that they commenced their management responsibilities to the date that they departed the company.

64.     Their serial failures properly to conduct the business of Blue Beverage led directly to the company's demise.  Some of their miscues were operational while others were financial.

65.     Although required to do so under the contract, in addition to refusing to fund Blue Beverage for the ninety (90) day period following their resignation, among other things Wertzberger and Wolcowitz:

   a)  failed to send Goldberger and Menczer weekly email reports detailing the
       company's weekly expenses;

   b)  failed to send Goldberger and Menczer detailed reports three (3) times a year
       regarding any advances and improvements experienced by the company;

    c)   significantly reduced rates paid by certain customers and clients without the requisite prior approval of Goldberger and Menczer;

    d)   incurred multiple individual expenses that each exceeded $20,000 without the prior consent of Goldberger and Menczer; and

    e)   hired employees and approved changes in employees' compensation without informing and obtaining the consent of Goldberger and Menczer.

66.    Moreover, based on the foregoing and for other reasons, disagreements regarding the day-to-day management of Blue Beverage arose and, in accordance with the contract, Goldberger and Menczer requested that those disputes be presented to Benzion Goldberger in an effort to resolve such disputes.

67.    Wertzberger and Wolcowitz, however, refused to participate in this contractually mandated dispute resolution procedure and they further refused to seek the assistance of a Rabbinical Court.

68.    The foregoing breaches of the contract, however, pale in comparison to the mismanagement of Blue Beverage that caused its demise.

69.    Notwithstanding the considerable investment of their own money into Blue Beverage, by the time that Wertzberger and Wolcowitz departed the company, the company's costs exceeded cash flow with no end in sight.

70.    Amongst their most important management responsibilities was production and quality control.  A primary aspect of this involved ensuring the proper use and maintenance of the very specialized equipment used in the product formulation and bottling processes.  Their failures in this regard included, but were not limited to:

a)   mandating that the retort machine be overloaded and set at temperatures that

    far exceeded the recommended temperatures, resulting in multiple

    breakdowns and the need to discard finished product, thereby causing

    considerable financial loss;

b)   failing timely and properly to make repairs the retort machines, which resulted

    in unnecessary multiple breakdowns and unsalable product runs;

c)   refusing to replace faulty machines and instead allowing the company to incur

    the cost of both repairing those machines and creating a massive inventory of

    unsalable products;

d)   failing properly to treat the retort machines, which resulted in the rusting of

    the interiors and the contamination of product that ultimately could not be

    sold;

e)   failing to ensure the proper calibration of the flow meters on machines that

    filled milk into bottles, causing either bottle filling overflows (which resulted

    in supplying customers with more product than they had paid for) or shortages

    in certain bottle runs, which rendered product produced during those

    particular runs unsalable;

f)   failing to make recommended repairs to ensure proper calibration;

g)   failing to repair or replace faulty "taptone" x-ray machines, which detect

    whether bottles are under filled or over filled; and

h)   creating an environment where significant extra waste was caused by failing

    and refusing to make necessary repairs or process changes, thus causing the

    company to incur extra unnecessary expense for waste removal.

71.    However, the management failures of Wertzberger and Wolcowitz were not limited to the maintenance and production spheres of the business.  They also failed to implement appropriate internal processes and controls in order to ensure efficiency.

72.    For example, in the entire period of their management of Blue Beverage, Wertzberger and Wolcowitz never reconciled the company's inventory.  As a result, there were no good records comparing figures regarding the volume of product produced in comparison with the product sent to customers, and they implemented no internal processes and procedures to cross-reference that information with cash flow.

73.    Moreover, prior to 2013, Blue Beverage did not pay a delivery charge for milk, which is delivered at least five (5) times weekly.  After Wertzberger and Wolcowitz took control, a per-delivery fee was imposed on Blue Beverage even though this was not, and still is not, in accordance with industry custom.

74.    At no time did Wertzberger and Wolcowitz address this issue with the milk suppliers.  Instead, they simply allowed these substantial fees to be unilaterally imposed and incurred by the company.

75.    The foregoing caused Blue Beverage to lose hundreds of thousands of dollars in monies expended that could and should have been avoided, and in the loss of business, including major customers who left Blue Beverage for other manufacturers/bottlers.

76.    As a result of the foregoing, during the period of Wertzberger's and Wolcowitz's management of Blue Beverage, the company's expenses exceeded its income, thereby creating an operating deficit and continuous losses.

77.    The hole created by Wertzberger and Wolcowitz too large for Blue Beverage to overcome after their departure.

78.    Unable to reverse its fortunes or to attract new investors, Blue Beverage ceased its operations in or about May 2016.

**The Fraudulent Mortgage and Note**

79.    According to the Amended Complaint, on September 4, 2014 Broadway Equity loaned $6,000,000 to 152 Broadway and Blue Beverage and, in connection therewith, a mortgage on the real property located at 152 Broadway, Village of Haverstraw, Town of Haverstraw, County of Rockland, State of New York (Tax Map Designation: Section 27.5, Block 2, Lot 1)(the "Property"), was given to Broadway Equity to secure the payment of the debt.

80.    The Amended Complaint further alleges that this purported $6,000,000 loan is evidenced by a promissory note (the "Note") in the sum of $6,000,000 that was executed by Goldberger on behalf of both 152 Broadway and Blue Beverage, and that both the mortgage and the Note were recorded in the Rockland County Clerk's Office as Instrument No. 2014-255287.

81.    These claims are a complete fabrication.

82.    Neither 152 Broadway nor Goldberger ever gave a mortgage on the Property to Broadway Equity, either in the sum of $6,000,000 or in any other amount.

83.    Neither 152 Broadway nor Blue Beverage (or their principal shareholders, Wertzberger and Wolcowitz) ever engaged in any business with or entered into any agreement with Broadway Equity.

84.    Upon information and belief, Broadway Equity was formed by or on behalf of Wertzberger and/or Wolcowitz for the sole purpose of foreclosing on the fraudulent mortgage.

85.    Upon information and belief, Judy Mintzer — Wolcowitz's wife — is the managing partner of Broadway Equity, but has no knowledge of the purpose(s) behind its formation.

86.     Upon information and belief, Broadway Equity has no assets other than the purported mortgage.

87.     Neither $6,000,000 nor any other sum of monies were ever "loaned" to 152 Broadway or Blue Beverage by Broadway Equity, its principal(s) or anyone on their respective behalves, whether in connection with the Property (where the bottling plant is located), the business of Blue Beverage or for any other reason.

88.     Furthermore, signatures on the mortgage and Note are forged.  Thus, Broadway Equity's contention that there was full and proper execution of these documents is also a complete fabrication.

89.     Wolcowitz's notarization was also fraudulent.

90.     In fact, to make matters worse, Wolcowitz was not present at the meeting whereby plaintiff claims documents were purportedly executed by Goldberger and Menczer.

91.     In all events, therefore, he had no basis for attesting that he personally witnessed the signing.

92.     All monies delivered to Blue Beverage by or on behalf of Wertzberger and Wolcowitz were in connection with the Commitment to Sell Contract and their investment in the company under that contract.

93.     None of those monies were part of any loan to Blue Beverage or its principal(s).

94.     In or about 2014, Wertzberger and Wolcowitz approached Goldberger with the suggestion that the monies invested in Blue Beverage under the Commitment to Sell Contract be secured by a mortgage on the Property in order to guarantee the return of their investment, which was funded primarily by several entities that, upon information and belief, were owned and/or operated by Wertzberger and/or Wolcowitz.

95.     However, the contract contains no language which speaks to any guarantee of repayment of monies invested by them, whether by the issuance of a mortgage or otherwise.  To the contrary, the contract contemplated and expressed the parties' recognition of the potential risks associated with Wertzberger's and Wolcowitz's investment in Blue Beverage.

96.     Goldberger never agreed to give the purported mortgage or the Note and, thus, there never was any meeting of the minds in this regard.

97.     Because the requested mortgage was never actually given to Broadway Equity, the signature on the purported loan documents were forged.

98.     Nevertheless, the purported mortgage was wrongfully and illegally filed by or on behalf of Broadway Equity, Wertzberger and Wolcowitz with the office of the Rockland County Clerk.

99.     Based on the foregoing, the very commencement of any action or proceeding by Broadway Equity to foreclose the purported mortgage at issue constitutes a fraud on this Court.

### AS AND FOR A FIRST COUNTERCLAIM
### (Breach of Contract)

100.    The counterclaim-plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in all preceding paragraphs as if fully set forth herein.

101.    On or about December 26, 2012, Goldberger and Menczer, on the one hand, and Wertzberger and Wolcowitz, on the other hand, entered into a Commitment to Sell Contract, pursuant to which Wertzberger and Wolcowitz were to invest monies into Blue Beverage, to perform all management functions on its behalf and, potentially, to acquire the company based on the payment of sums as previously identified herein.

102.    The failure of Wertzberger and Wolcowitz properly to perform their management obligations, as detailed previously herein, constitutes a breach of the Commitment to Sell Contract.

103.    As a direct consequence of Wertzberger's and Wolcowitz's breach of the parties' contract, Blue Beverage suffered significant monetary damages, including, but not limited to, lost customers, lost sales, lost profits, and considerable unnecessary expenses.

104.    Ultimately, Wertzberger's and Wolcowitz's management failures directly led to the demise of Blue Beverage, which was forced to cease operations and close its doors.

105.    The foregoing would not have occurred absent Goldberger's and Menczer's contract with Wertzberger and Wolcowitz, and they and their company suffered permanent and irreparable harm both to their business and their collective reputations in the marketplace.

106.    Goldberger and Menczer fully and properly performed all of their obligations under the parties' contract, which was entered by them in good faith, prior to the wrongful and unilateral breach of Wertzberger and Wolcowitz.

107.    By reason of the foregoing, Goldberger and Menczer have jointly and severally suffered damages in an amount to be determined at trial, but is not less than $5,000,000 plus statutory interest.

## AS AND FOR A SECOND COUNTERCLAIM
### (Slander of Title)

108.    The counterclaim-plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in all preceding paragraphs as if fully set forth herein.

109.    As set forth previously herein, Broadway Equity seeks to foreclose on a mortgage that was never given by 152 Broadway.

110.    Broadway Equity and its principals, were and continue to be fully aware that the claims regarding a $6,000,000 loan to 152 Broadway secured by the subject real property and evidenced by a Note signed by Goldberger are complete fabrication.

111.    There was no $6,000,000 loan, the purported mortgage was never given to Broadway Equity and any Note that purports to evidence a $6,000,000 debt by virtue of Goldberger's and/or Menczer's signature is a forgery.

112.    Nevertheless, Broadway Equity and its principal(s) and/or authorized agents recorded the purported mortgage with the Rockland County Clerk's Office.

113.    In so doing, Broadway Equity and its principal(s) and/or authorized agents have published statements that are objectively untrue and falsely cast doubts on the validity of 152 Broadway's title.  As a result, the marketability and/or ability for 152 Broadway to use the property as collateral for any legitimate loan or other financing is fully impaired.

114.    Broadway Equity, its principals and/or authorized agents knew that the statements and representations in the purported mortgage were untrue.  They acted with malice in creating and recording of the phony mortgage, which was reasonably calculated to cause, and has caused, harm to 152 Broadway and its principals, thereby resulting in special damages, including, but not limited to, the inability to sell the property at the appropriate market rate.

115.    It was reasonably foreseeable that the recording of a false mortgage (and the forged Note) could impair the value and/or marketability of the property in the estimation of others.

116.    By reason of the foregoing, 152 Broadway has sustained actual damages in an amount to be proven at trial, but in no event is less $6,000,000.00 plus statutory interest.

## AS AND FOR A THIRD COUNTERCLAIM
## <u>(Quiet Title/Declaratory Judgment Voiding The Mortgage)</u>

117.    The counterclaim-plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in all preceding paragraphs as if fully set forth herein.

118.    Based on the foregoing, 152 Broadway is entitled to relief in accordance with Article 15 of the New York Real Property Actions and Proceedings Law.

119.    152 Broadway is the owner of the Property.

120.    152 Broadway purchased the Property and acquired title by a deed of conveyance.

121.    Based on the public records, which are confirmed by Broadway Equity's pleadings in this action, Broadway Equity unjustly claims an interest or estate in the Property that would be adverse to 152 Broadway's ownership thereof.

122.    152 Broadway is seized and possessed of the Property free any and every such claim or lien which has been, may have been, or could have been claimed or asserted by 152 Broadway or its principal(s).

123.    Neither Broadway Equity nor its principals is unknown and none is an infant, mentally retarded, mentally ill, or an alcohol abuser.

124.    The judgment rendered in connection with this claim will not and cannot affect any person or persons not in being or not ascertained at the commencement of this action who by any contingency contained in a devise or grant or otherwise could afterward become entitled to a beneficial estate or interest in the property involved.  Every person in being who would have been entitled to such estate or interest of such event had happened immediately before the commencement of this action is named as a party hereto.

125.    No personal claim has been made against any party herein who does not assert a claim adverse to the claim of 152 Broadway.

126.    By reason of the foregoing, 152 Broadway is entitled to judgment declaring that the mortgage that is the subject of the underlying foreclosure action is null, void, and of no force and effect, and should be immediately removed from the public record.

127.    By reason of the foregoing, 152 Broadway demands judgment against Broadway Equity, and all persons claiming under it:

    a)  that Broadway Equity and its principal(s) be forever barred from all claim or claims to an estate or interest in the Property or lien or encumbrance thereon of any kind or nature whatsoever;

    b)  that it be adjudged and decreed that 152 Broadway is the lawful owner of the Property, and entitled to the lawful, peaceful and uninterrupted possession and use of the Property against Broadway Equity and all others;

    c)  declaring that 152 Broadway may have a writ of assistance upon the failure of Broadway Equity or anyone on its behalf in possession of the Property, or any portion thereof, to vacate the Property after service of a copy of a judgment herein; and

    d)  granting such other and further relief as the Court deems just and proper, together with the costs and expenses of this action.

### AS AND FOR A FOURTH COUNTERCLAIM
### (Violation of Executive Law 135 – Notarial Misconduct)

128.    The counterclaim-plaintiffs repeat, reallege and incorporate by reference each and every allegation contained in all preceding paragraphs as if fully set forth herein.

129.    As described previously herein, Goldberger executed neither the Note nor the mortgage relied upon by Broadway Equity in fraudulently seeking a judgment of foreclosure.

130.    Similarly, although a second signature on the Note is purported to have been affixed by Menczer, that signature did not come from his hand and was forged.

131.    Nevertheless, by virtue of his notarization, Wolcowitz purports to have witnessed Goldberger's signing of both the Note and the mortgage, and he further purports to have witnessed Menczer's signature on the Note.

132.    Both documents contain Wolcowitz's notary stamp and statements affirming that he witnesses such signatures.

133.    Wolcowitz could not and, in fact, did not, witness their signatures.

134.    His sworn to representations otherwise, therefore, were false and fraudulent.

135.    In addition to falsely representing having witnessing the signatures of Goldberger and Menczer, he also misrepresented his actual location on the date of the purported signing of the mortgage and the Note.

136.    Although both the mortgage and the Note were purportedly executed in Kings County on September 4, 2014, upon information and belief, Wolcowitz was not present.

137.    A notary public is not permitted to notarize a signature if the signer is not in his presence and he does not actually witness the signature.

138.    Wolcowitz's fraudulent notarization of both the mortgage and the Note constitutes notarial misconduct that subjects him to civil liability.

139.    Both Goldberger and Menczer have been damaged as a result of such notarial misconduct.

140.    By reason of the foregoing, Goldberger and Menczer are entitled to compensatory damages in an amount to be proven at trial, but in no event is less $5,000,000 and punitive damages in an amount to be determined by this Court, plus statutory interest.

## <u>CLAIM FOR RELIEF</u>

**WHEREFORE,** defendants-counterclaim plaintiffs respectfully request that judgment be granted as follows:

a) On the First Counterclaim, awarding compensatory against Wertzberger and Wolcowitz in an amount be determined at trial, but in any event not less than $5,000,000 plus interest;

b) On the Second Counterclaim, awarding counterclaims-plaintiffs compensatory and consequential damages in an amount be determined at trial, but in any event not less than $6,000,000 plus interest;

c) On the Third Counterclaim, against Broadway Equity, and all persons claiming under it, declaring that the mortgage that is the subject of the underlying foreclosure action is null, void, and of no force and effect, and should be immediately removed from the public record; declaring that Broadway Equity and its principal(s) be forever barred from all claim or claims to an estate or interest in the Property or lien or encumbrance thereon of any kind or nature whatsoever; that it be adjudged and decreed that 152 Broadway is the lawful owner of the Property, and entitled to the lawful, peaceful and uninterrupted possession and use of the Property against Broadway Equity and all others; and declaring that 152 Broadway may have a writ of assistance upon the failure of Broadway Equity or anyone on its behalf in possession of the Property, or any portion thereof, to vacate the Property after service of a copy of a judgment herein;

d)  On the Fourth Counterclaim, awarding counterclaims-plaintiffs compensatory and consequential damages in an amount be determined at trial, but in any event not less than $5,000,000 plus interest;

e)  Awarding counterclaim-plaintiffs all of their costs and expenses incurred in connection with this action, including, but not limited to, their reasonable attorneys' fees; and

f)  Granting such other and further relief as the Court deems just and proper.

Dated:    New York, New York
          October 26, 2017          **THE LAW OFFICE OF JEFFREY FLEISCHMANN**
                                    *Attorney for Defendants-Counterclaim Plaintiffs*


                                    By:  /s/ Jeffrey Fleischmann
                                         Jeffrey Fleischmann
                                    150 Broadway, Suite 900
                                    New York, New York 10038
                                    Tel: (646) 657-9623
                                    jf@lawjf.com