Jeffrey Fleischmann
The Law Office of Jeffrey Fleischmann PC
150 Broadway, Suite 900
New York, New York 10038
Tel: (646) 657-9623
jf@lawjf.com
*Attorneys for Defendants and*
*Counterclaim Plaintiffs*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
------------------------------------------------------------------X

In re:

BROADWAY EQUITY HOLDINGS LLC,

                                        Debtor.

------------------------------------------------------------------X

BROADWAY EQUITY HOLDINGS LLC,

                                        Plaintiff,

         -against-

152 BROADWAY HAVERSTRAW NY LLC,
BLUE BEVERAGE GROUP, INC., JOSEPH
GOLDBERGER, TOBY WEINBERGER, MFT
HOLDINGS LLC, ESTATE OF JENO GUTTMAN,
RYVKIE GOLDBERGER, LAND TRACK TITLE
AGENCY, LLC, VILLAGE OF HAVERSTRAW
RECEIVER OF TAXES, COMMISSIONER OF
FINANCE OF THE COUNTY OF ROCKLAND,
NEW YORK STATE DEPARTMENT OF
TAXATION AND FINANCE, "JOHN DOE NO. 1"
through "JOHN DOE NO. 10", and said names being
fictitious, it being the intention of Plaintiff to
designate all persons, partnerships, corporations, or
other entities in possession of the premises, as tenant
or otherwise any/or all persons or entities having or
claiming an interest in said premises,

                                        Defendants.

------------------------------------------------------------------X

**HEARING DATE AND TIME:**

Chapter 11

Case No. 17-22242 (RDD)

Adversary Case No. 17-8215
(RDD)

BLUE BEVERAGE GROUP, INC., JOSEPH
GOLDBERGER and JOSEPH MENCZER,

                Counterclaim Plaintiffs,

      - against –

BROADWAY EQUITY HOLDINGS LLC,
JOEL WERTZBERGER a/k/a JOEL
WURTZBERGER, ARON WOLCOWITZ
a/k/a ARON JACOB WOLKOWITZ a/k/a
JACK WALKOWITZ and JUDY MINSTER,

              Counterclaim Defendants.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## **MEMORANDUM IN SUPPORT DEFENDANTS' MOTION *IN LIMINE***

      Defendants 152 Broadway Haverstraw NY LLC ("152 Broadway"), Blue Beverage Group,

Inc. ("Blue Beverage"), Joseph Goldberger ("Goldberger"), Toby Weinberger ("Weinberger"),

MFT Holdings LLC ("MFT"), Estate of Jeno Guttman ("Guttman Estate"), and Ryvkie Goldberger

("Ryvkie")(collectively "defendants") and counterclaim plaintiff Joseph Menczer ("Menczer")

respectfully submit this motion *in limine* pursuant to Fed. R. Civ. P 37(c)(1), Fed. R. Evid. 401,

402, 403, 901, 1002 and 1003, and in accordance with governing case law and other relevant law,

for an order: (i) precluding Donna O. Eisenberg ("Eisenberg"), retained by plaintiff as its forensic

document examiner, from offering testimony at the trial respecting any matter related to the

disputed signature(s) of third-party plaintiff Joseph Menczer; (ii) prohibiting plaintiff or

counterclaim-defendants from offering into evidence any expert report or other report prepared by

Eisenberg in connection with this action; (iii) striking the Expert Declaration of Forensic Document

Examiner Donna O. Eisenberg ("Eisenberg Decl.") and precluding its introduction or use as

evidence at the trial of this action; (iv) striking and precluding the introduction as evidence in this

action the transcript of the deposition of Eisenberg; (v) excluding any testimony regarding

Eisenberg, any forensic document or other examination provided by Eisenberg, any report prepared

by or on behalf of Eisenberg, and/or any testimony given by Eisenberg under oath; (vi) excluding

all proposed trial exhibits respecting any of the foregoing or any other matter involving Eisenberg;

and (vii) granting such other and further relief as the Court deems just and proper.

## ARGUMENT

**I.    Eisenberg's Reports Fail To Identify The Methodology Used
In Arriving at Her Conclusions and Preparing That Report**

As this Court is aware, the admissibility of expert testimony is governed principally by Rule

702 of the Federal Rules of Evidence, which states as follows:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to
> understand the evidence or to determine a fact in issue, a witness qualified as an
> expert by knowledge, skill, experience, training, or education, may testify thereto in
> the form of an opinion or otherwise, if (1) the testimony is based upon sufficient
> facts or data, (2) the testimony is the product of reliable principles and methods, and
> (3) the witness has applied the principles and methods reliably to the facts of the
> case.

*See* Fed. R. Evid. 702.  Arising from this is what is now known as the *Daubert* standard, which

further established a rule of evidence regarding the admissibility of expert witness testimony.  *See*

*Daubert v. Merrill Dow Pharmaceuticals,* 509 U.S. 579, 113 S. Ct. 2786 (1993).

Of critical importance are the list of factors that district courts consider in evaluating

whether a proffered expert opinion has the required indicia of scientific reliability.  Particularly

important in the analysis is the methodology used by the proffered expert and determining whether

that methodology is reliable.  *See Nimely v. City of New York*, 414 F. 3d 381, 396 (2d Cir. 2005).

Expert opinion is unreliable and must be excluded in accordance with both Rule 702 and *Daubert*

"when [that] expert opinion is based on data, a methodology, or studies that are simply inadequate

to support the conclusions reached…"  *Id.* at 396, 397, *quoting Amorgianos v. Amtrak*, 303 F. 3d

256, 266 (2d Cir. 2002).

Here, the critical elements of identifying the methodology used and conclusions based on

the use of such methodology are both noticeably absent from Eisenberg's reports.  Although the

Eisenberg Decl. includes the representation that Eisenberg's reports identified a "systematic examination of the known and questioned signatures…based on the standard guidelines developed by The Scientific Working Group for Forensic Document Examination ("SWGDOC")" and that Eisenberg used this "methodology in preparing my reports and establishing my opinions," nowhere do her reports identify SWGDOC, its guidelines, how she complied with those guidelines, or the nexus between her use and compliance with such guidelines (whatever they may be) and her analysis and conclusions.  *See* Eisenberg Decl., ¶13.

During her deposition, Eisenberg confirmed her failure to identify SWGDOC, its guidelines or any established methodology:

Q.  Does your report recite every step taken by you to reach your conclusion or opinion?

A.  No.

*See* Deposition of Donna O. Eisenberg ("Eisenberg Dep.") at 64:13-16.

Q.  So I'm asking:  What is not in there?  What is not recited?

A.  …And I don't reference SWGDOC definitions in my report.  I'm using them but I don't reference them.

*See* Eisenberg Dep. at 65:5-6, 12-15.

Given that Eisenberg's declaration and deposition testimony placed such importance in engaging in a methodology that would have been compliance with SWGDOC, her reports should (i) identify the SWGDOC; (ii) identify the guidelines established by the SWGDOC for determining the authenticity of signatures; (iii) identify and explain the manner in which those guidelines were followed and/or complied with; and (iv) explain how she arrived at her conclusions based on a proper use of methodology based on those guidelines.

They do not.  The reports prepared by Eisenberg contain none of the foregoing and a cursory mention of SWGDOC guidelines in her declaration for trial and during her deposition does not cure

the insufficiency of the reports.  Rule 37(c)(1) of the Federal Rules of Civil Procedure permits

courts to preclude expert testimony and information included in an expert report if the party

proffering it has violated Fed. R. Civ. P. 26(a) by failing to provide material information as

required.  *See Conte v. Newsday, Inc.*, 2011 U.S. Dist. LEXIS 157723, *5. (E.D.N.Y. 2011); *SEC v.*

*Lek Sec. Corp.*, 2019 U.S. Dist. LEXIS 60202 (S.D.N.Y. 2019)(motion to exclude expert granted).

This Court should do so here.

For these reasons alone, Eisenberg's reports should not be admitted into evidence at trial.  It,

therefore, follows both that Eisenberg should be precluded from testifying at trial and that her

declaration be stricken.

II.     **By Eisenberg's Own Admission, She Was Not Asked To, and Did Not Authenticate
        The Documents; Eisenberg's Report and Testimony Should Be Precluded**

Even if this Court determines that Eisenberg properly and sufficiently identified the

methodology used in arriving at her opinion and in preparing reports (and, respectfully, she did not),

her failure to establish the authenticity of either questioned signature mandates that Eisenberg's

testimony, reports and declaration under oath be precluded from the trial of this action.

As this Court is aware, at issue in this case is the fact that plaintiff had initially represented

to this Court that it had in its possession the original questioned document, and plaintiff further

represented that that document contained the original signatures of Menczer and Goldberger.  This

Court is further aware that the Note, assuming *arguendo* that it ever existed, mysteriously

disappeared during the pendency of this action.

Nevertheless, in her report respecting the signature of Menczer, Eisenberg concluded that

Menczer "probably wrote" the signature on the document that she examined and reviewed.

Eisenberg also concluded that Goldberger did write the signature on the documents she reviewed

and examined.  However, she came to this conclusion without ever having determined whether the

documents she examined were authentic.  Upon inquiry, Eisenberg was questioned respecting her

role in this case and the documents that she was retained to review and opine on[1]:

> Q.  What was your understanding of your assignment in this case?
>
> A.  That there were questioned signatures on two documents…and that I was going
>
> to have to assess that – I explained that I needed known exemplars and that originals
>
> were the best and that the timeframe bracketing the questioned signatures was most
>
> ideal.  And that's what was provided to me.
>
> Q.  Were you asked to determine the authenticity of the documents that you
>
> examined?
>
> A.  No.
>
> Q.  Do you know why not?
>
> A.  My assignment was to determine the authenticity of the signatures.
>
> Q.  So you formed no opinion about the authenticity of the documents, correct?
>
> A.  Correct.

*See* Eisenberg Dep. at 53:18-25; 54:1-13.

Later in her deposition, Eisenberg confirmed that she was not asked to, and did not,

determine the authenticity of the documents:

> Q.  Remember I asked you before about the authenticity of the documents"
>
> A.  Yes.
>
> Q.  Are you opining on that?
>
> A.  I wasn't asked to – that was not my assignment.

---

[1]    Copies of the cited pages from the transcript of Eisenberg's deposition ("Eisenberg Dep.") are annexed to the accompanying declaration of Jeffrey Fleischmann ("Fleischmann Decl.") as **Exhibit A**.

Q.  Sure.  So you're not opining on that, correct?

A.  Yes, that's correct.

*See* Eisenberg Dep. at 66:17-25; 67:2.

Given what Eisenberg testified to with respect to her limited role, which did not include determining whether the documents that she reviewed were authentic, the following inquiry and exchange took place:

Q.  Would you be able to opine on the authenticity of the documents that you were asked to review?

A.  No.

Q.  Why not?

A.  Mostly because I was given the signature page of a documents and documents are not --- whatever's in the document, that's not my area of expertise.  The signatures in this case are my area of expertise.

Q.  You said before that you're a forensic document examiner.  What does that mean?

A.  That I offset – I assess the authenticity of documents, I determine if they've been altered in any way, and I do handwriting comparisons.

*See* Eisenberg Dep. at 67:13-15; 68:2-6.

As a result of the apparent contradiction between Eisenberg first testifying that she is not an expert in determining the authenticity of documents and then testifying otherwise, the inquiry continued:

Q.  So you consider yourself to be an expert in assessing authenticity of documents, correct?

A.  It depends on the documents….

Q.  So if I asked you to assess the authenticity of the documents that you were asked
to review in this case, you could not do so?

A.  Correct.

Q.  Does it matter to you that – whether or not you were reviewing a photocopy
versus an original?

A.  It depends on the quality of the photocopy.

Q.  Let me ask you this question.  If I take a copy or a PDF of a known – of a
legitimate signature, and I show it to you – well, withdrawn.  What if I copy and
paste a known signature into a document and make a photo, and then I show you a
moment, would you be able to determine if the document was real or not?

A.  No.  I could opine on the signature, but not the document.

*See* Eisenberg Dep. at 68:12-15, 25; 69:2-21.

The inquiry then established that, of the signatures of Goldberger and Menczer reviewed by
Eisenberg, three (3) out of four (4) were photocopies, and that the one questioned signature of
Menczer was a photocopy.   The questioning continued:

Q.  You told me before that it's possible that – you opine on the – the authenticity of
the signature, but not the document, correct?

A.  Correct.

Q.  So it's theoretically possible for somebody to copy and paste an authentic
signature, give you a copy, and you would know if the document is real or not
because maybe it's a copy of an authentic signature.  Correct or incorrect?

………………..

A.  Yes, I'm talking about authenticating signatures, not documents.

Q. Right. So I guess what I'm saying to you is, if some of the things you were asked

to look at in this case are only photocopies, you could not say one way or another

whether or not the document is real; you could only say that the signature looks like

the real signature. Correct or incorrect?

A. Correct.

*See* Eisenberg Dep. at 71:5-15, 19-25; 72:2-6.

The foregoing conclusively demonstrates both that Eisenberg was not asked to determine

whether the document containing the questioned signatures was authentic and that, as a result,

Eisenberg did not make any determination respecting the documents' authenticity.

Further, Eisenberg admitted that she had no way of knowing whether the signature on the

photocopy that she did review was of a real signature affixed to that document or of a signature that

came from somewhere else that was copied and pasted onto that photocopy.

Noteworthy is the fact that, in providing expert opinion in another case involving the

question of whether a deed and the signature thereon were authentic, Eisenberg came to a different

conclusion than she did here and pointed out the possibility that the signature in question could have

been placed on the document via untoward means. In that case, between what she called a "good

sister" and a "bad sister," Eisenberg "testified that the authenticity of the deed could not be

determined," because "the signatures on the deed were pictorially similar to…the good sister's

authentic signature, but given that that is the photocopy, there was no way for me to determine

whether someone used Photoshop or some other means of putting the sister's name on the

document. So without the original, I could not opine on the authenticity of the deed." *See*

Eisenberg Dep at 49:13-25; 50:2.

Although in this case, Eisenberg does not opine on the authenticity of the document

containing Menczer's purported signature, she does conclude that his signature is "probably"

authentic even though it, too, could have been the result of someone using Photoshop or other means to put Menczer's name on the document.

In short, by Eisenberg's own analysis and testimony, she has no way of knowing whether the purported signatures, even if they appeared to her to be authentic (while the document she analyzed is not), was ever affixed on the writing that plaintiff relies upon in support of its underlying case. For these reasons, Eisenberg's reports, testimony and declaration should be precluded from the trial of this action.

**III.    An Order of Preclusion is Mandated Because Eisenberg's Conclusions Respecting Menczer's Signature Are Based Solely On Challenged Writings**

According to the Eisenberg Decl. (and Eisenberg's report), it is her expert opinion that Joseph Menczer "probably wrote the 'Joseph Menczer' signature on the Exhibit Q1 document (i.e., the challenged signature on the purported Note). *See* Eisenberg Decl., ¶ 17. However, Eisenberg arrives at this conclusion in a strained, roundabout way in an effort to shoe horn her analysis into the client's desired conclusion.

By Eisenberg's own admission, the "probably wrote" opinion "falls short of an identification." First, she notes that the Exhibit Q1 document signature "is abbreviated such that only the capital letters "J and M" are legible. Then, after reviewing the signatures affixed to each of Exhibits K2 through K28, she concludes that the lower case letters, which are legible in these writings, "are not comparable to the illegible letter designs found in Q1." In other words, the signatures of Q1, on the one hand, and K2 through K28, on the other hand, are noticeably different and a comparison of these documents cannot lead to the conclusion that they all came from the same hand.

One would reasonably wonder, then, how Eisenberg could then determine that the Q1 signature is Menczer's actual signature. One also wonders how she came to the conclusion that

Menczer sometimes used an "abbreviated" signature when <u>not</u> <u>a</u> <u>single</u> <u>one</u> of Exhibits K2 through

K28 also has this "abbreviated" signature.  *See* Eisenberg Decl., ¶ 18.

Instead of noting these problems, Eisenberg looked to Exhibit K1, which, in her opinion,

also contains Menczer's "abbreviated" signature.  Thus, ignoring the other "full" signatures that

contain fully realized "lower case" letters and, therefore, do not resemble Q1 at all, Eisenberg uses

K1 to conclude that the use of "abbreviated design" on both Q1 and K1 "demonstrates that Exhibit

Q1 falls within the range of variation exhibited among the known exemplars of Menczer."  *See*

Eisenberg Decl., ¶ 18.

This alone calls into question the credibility of Eisenberg and her conclusions.  However,

also missing from Eisenberg's declaration and report is the critical fact that **K1, like Q1, <u>is</u> <u>also</u> <u>a</u>**

**<u>challenged</u> <u>document</u>**.  Indeed, K1 appears to have been supplied to Eisenberg by plaintiff's

counsel – not from the numerous exemplars provided by Menczer – and there is no evidence that

the signature on K1 is Menczer's signature.[2]  That is, it is defendants' contention that Menczer's

signatures on both writings were forged.  Thus, Eisenberg relies on a single signature, one that has

been challenged as a forgery, to authenticate another signature that also has been challenged as a

forgery.  How she can do this is beyond any reasonable comprehension.

It is readily apparent that Eisenberg's reference to the signatures on K2 through K28 is a

"smoke and mirrors" attempt to create the illusion of a thorough and proper analysis when her

review of those signatures – and the fact that they are completely different from the Q1 signature –

played no role in her opinion at all.  It is also obvious that Eisenberg's opinion is simply the one

desired by those paying her fee because there was no reasonable basis for her to conclude that,

based on a comparison of Q1 to K2 through 28, the signatures came from the same hand.  Instead,

---

[2]      It is also notable that K1 was not turned over to defendants until in or about December 2018, many
months after Eisenberg's report was issued.

she relies on two purportedly forged signatures without once thinking that perhaps their similarity is the result of their coming from the same hand – one that ***does not*** belong to Menczer.  Copies of Exhibits Q1 and K1 through K28 are annexed to the Fleischmann Decl. as **Exhibit B**.

Based on the foregoing, Eisenberg's reports should be thrown out and precluded from being offered or entered into evidence at trial.  Moreover, there is no basis for this Court to permit Eisenberg to offer any expert testimony at trial or to allow her declaration to be used for any purpose.

WHEREFORE, it is respectfully requested that this Court grant defendants-counterclaim plaintiffs' motion *in limine* in its entirety; that it preclude Eisenberg from testifying at the trial of this action; that it prohibit plaintiff and counterclaim-defendants from offering into evidence any expert report or other report prepared by Eisenberg in connection with this action; that it strike Eisenberg's declaration and preclude its introduction or use as evidence at the trial of this action; that it strike and preclude the introduction as evidence in this action the transcript of the deposition of Eisenberg; that it exclude any testimony regarding Eisenberg, any forensic document or other examination provided by Eisenberg, any report prepared by or on behalf of Eisenberg, and/or any testimony given by Eisenberg under oath; that it exclude from use at trial all proposed trial exhibits respecting any of the foregoing or any other matter involving Eisenberg or her analysis or reports; and that it grant such other and further relief as it deems just and proper.

Dated: New York, New York
      April 23, 2018

Respectfully submitted,

LAW OFFICE OF JEFFREY FLEISCHMANN PC

By: /s/ Jeffrey Fleischmann
      Jeffrey Fleischmann
150 Broadway, Suite 900
New York, New York  10038
Telephone:  (646) 657-9623
Facsimile:   (646) 351-0694
*Attorney for Defendants 152 Broadway Haverstraw
NY LLC, Blue Beverage Group, Inc., Joseph
Goldberger, Toby Weinberger, MFT Holdings LLC,
Estate of Jeno Guttman and Ryvkie Goldberger*

*and*

*Counterclaim Plaintiff Joseph Menczer*