UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

HEARING DATE: 5/1/19
HEARING TIME: 10:00 A.M.

-------------------------------------------------------------X

In re:

BROADWAY EQUITY HOLDINGS LLC,

Chapter 11

Case No. 17-22242 (RDD)

Debtor.

-------------------------------------------------------------X

BROADWAY EQUITY HOLDINGS LLC,

Adversary Case No. 17-8215 (RDD)

Plaintiff,

-against-

152 BROADWAY HAVERSTRAW NY LLC, BLUE BEVERAGE GROUP, INC., JOSEPH GOLDBERGER, TOBY WEINBERGER, MFT HOLDINGS LLC, ESTATE OF JENO GUTTMAN, RYVKIE GOLDBERGER, LAND TRACK TITLE AGENCY, LLC, VILLAGE OF HAVERSTRAW RECEIVER OF TAXES, COMMISSIONER OF FINANCE OF THE COUNTY OF ROCKLAND, NEW YORK STATE DEPARTMENT OF TAXATION AND FINANCE, "JOHN DOE NO. 1" through "JOHN DOE NO. 10", and said names being fictitious, it being the intention of Plaintiff to designate all persons, partnerships, corporations, or other entities in possession of the premises, as tenant or otherwise any/or all persons or entities having or claiming an interest in said premises,

Defendants.

-------------------------------------------------------------X

BLUE BEVERAGE GROUP, INC. and JOSEPH GOLDBERGER,

Counterclaim Plaintiffs,

- against –

BROADWAY EQUITY HOLDINGS LLC,
JOEL WERTZBERGER a/k/a JOEL
WURTZBERGER, ARON WOLCOWITZ
a/k/a ARON JACOB WOLKOWITZ a/k/a
JACK WALKOWITZ and JUDY MINSTER,

Counterclaim Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

## MEMORANDUM OF LAW OF PLAINTIFF BROADWAY EQUITY HOLDINGS LLC IN OPPOSITION TO DEFENDANTS' MOTION *IN LIMINE*

ROBINSON BROG LEINWAND
  GREENE GENOVESE & GLUCK P.C.
875 Third Avenue, 9th Floor
New York, New York 10022
(212) 603-6300

*Attorneys for Broadway Equity Holdings
LLC*

{01003326.DOCX;5 }

# TABLE OF CONTENTS

PRELIMINARY STATEMENT ................................................................. 2

ARGUMENT ........................................................................................ 5

I.    FORENSIC DOCUMENT EXPERTISE IS RELIABLE AND ADMISSIBLE
      AS "TECHNICAL, OR OTHER SPECIALIZED KNOWLEDGE" UNDER
      RULE 702 OF THE FEDERAL RULES OF EVIDENCE................................ 5

II.   THE EXPERT REPORTS IDENTIFIED AND DESCRIBED THE
      METHODOLOGY USED TO PROVIDE EISENBERG'S OPINION................ 8

III.  THE FACT THAT EISENBERG DID NOT AUTHENTICATE THE NOTE
      AND THE   MORTGAGE IS IRRELEVANT TO THE ADMISSIBILITY
      OF HER TESTIMONY...................................................................... 14

IV.   THE MOVING PARTIES FALSELY CLAIM THAT EISENBERG'S
      CONCLUSIONS WITH RESPECT TO MENCZER'S SIGNATURE ARE
      BASED SOLELY ON CHALLENGED WRITINGS; THEY ARE NOT. ......... 15

CONCLUSION......................................................................................... 18

## TABLE OF AUTHORITIES

Page(s)

Cases

*Daubert v. Merrell Dow Pharmaceuticals, Inc.,*
   509 U.S. 579 (1993) ................................................................................ 2, 6, 13

*Frye v. United States,*
   293 F. 1013 (D.C. Cir. 1923) .......................................................................... 5

*Khumo Tire Company v. Carmichael,*
   526 U.S. 137 (1999) .................................................................................... 2, 5

*Nimely v. City of New York,*
   414 F.3d 381 (2d Cir. 2005) ............................................................................ 5

*Travelers Prop. & Cas. Corp. v. GE,*
   150 F. Supp. 2d 360 (D. Conn. 2001) ............................................................ 13

*United States v. Adeyi,*
   165 F. App'x 944 (2d Cir. 2006) ...................................................................... 6

*United States v. Brooks,*
   2010 WL 291769 (E.D.N.Y. Jan. 11, 2010) ..................................................... 6

*United States v. Jabali,*
   2003 WL 22170595 (E.D.N.Y. Sept. 12, 2003) ................................................ 6

*United States v. Starzecpyzel,*
   880 F. Supp. 1027 (S.D.N.Y. 1995) .............................................................. 6, 7

*United States v. Tarantino,*
   2011 WL 1113504 (E.D.N.Y. Mar. 23, 2011) ................................................... 6

Other Authorities

Federal Rules of Evidence Rule 702 ............................................................ 2, 5, 6, 7

{01003326.DOCX;5 }

Plaintiff Broadway Equity Holdings LLC ("Plaintiff"), by and through its attorneys, respectfully submits this memorandum of law, together with the Declaration of Nicholas M. Menasché, Esq. dated April 29, 2019 (the "Menasché Decl."), and exhibit thereto, in opposition to the motion *in limine* (the "Motion" or "Mot.") of defendants 152 Broadway Haverstraw NY LLC, Blue Beverage Group, Inc., Joseph Goldberger ("Goldberger"), Toby Weinberger, MFT Holdings LLC, Estate Of Jeno Guttman, Ryvkie Goldberger (collectively, "Defendants") and counterclaim plaintiff Joseph Menczer ("Menczer", together with Defendants, the "Moving Parties") for an order: (i) precluding Donna O. Eisenberg ("Eisenberg"), the forensic document examiner retained by Plaintiff, from offering testimony at the trial in the above-captioned action (the "Adversary Proceeding") respecting any matter related to the disputed signature(s) of Menczer; (ii) prohibiting Plaintiff or Counterclaim Defendants from offering into evidence Eisenberg's forensic handwriting reports for Menczer and Goldberger (the "Expert Reports") in connection with the Adversary Proceeding; (iii) striking the Expert Declaration of Forensic Document Examiner Donna O. Eisenberg and precluding its introduction or use as evidence at the trial of the Adversary Proceeding; (iv) striking and precluding the introduction as evidence in the Adversary Proceeding the transcript of the deposition of Eisenberg; (v) excluding any testimony regarding Eisenberg, any forensic document or other examination provided by Eisenberg, any report prepared by or on behalf of Eisenberg, and/or any testimony given by Eisenberg under oath;

and (vi) excluding all proposed trial exhibits respecting any of the foregoing or any other matter involving Eisenberg.[1]

## PRELIMINARY STATEMENT

The Motion is bereft of merit and should be denied in its entirety for the following reasons. First, it is well-accepted that forensic document examination expertise is reliable and admissible as "technical or other specialized knowledge" under Rule 702 of the Federal Rules of Evidence ("FRE"). The Expert Reports establish that Eisenberg is a highly-qualified expert holding a Certificate of Qualification in Forensic Document Examination from the American Board of Forensic Document Examiners and rendered her expert opinion based on her training and years of experience in this field. Indeed, as confirmed at Eisenberg's deposition, in every case where Eisenberg has served as an expert in the field of forensic document examination, no court has ever precluded Eisenberg from testifying as an expert.

Second, contrary to the Moving Parties' specious claim, the Expert Reports and Eisenberg's subsequent deposition testimony exceeded the standards announced in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), and *Khumo Tire Company v. Carmichael*, 526 U.S. 137 (1999). Eisenberg described in detail her methodology for her findings and her ultimate opinion. She analyzed the letter

---

[1]    Unless otherwise expressly defined herein, capitalized terms used herein have the same meanings ascribed to such terms as set forth in the operative complaint in the Adversary Proceeding.

forms of each questioned signature, comparing them to twenty-eight (28) exemplars[2] for Menczer and twenty-seven (27) exemplars for Goldberger,[3] and providing several addendums for each of her reports that compared the signatures to the exemplars. In response to over five hours of detailed questioning at her deposition, Eisenberg repeatedly explained her analysis and the governing standards that all forensic document examiners follow in concluding that Goldberger's exemplars were sufficient for an identification of his signature on the Note and Mortgage and that Menczer probably wrote the signature on the Note.

Third, the Motion attempts to preclude use of the Expert Reports and Eisenberg's testimony purportedly because she did not opine on the authenticity of the documents constituting the Note and Mortgage. This is a red herring. Plaintiff will establish the authenticity of these documents through other evidence. Eisenberg's opinion is limited to whether Menczer's and Goldberger's **signatures** on the questioned documents are authentic, based on the exemplars as matched to the signatures on the Note and the Mortgage. The Expert Reports assist the trier of fact in probing the veracity of Defendants' forgery claims and are highly relevant. On the other hand, there is no danger of prejudice in allowing the trier of fact to hear and evaluate this testimony, especially because the parties claiming the Note and Mortgage contain forged signatures have failed to proffer any expert or report

---

2       The exemplars, excepting K-1 for the expert report on Menczer's signature, were produced to Plaintiff by counsel for the Moving Parties, as directed by the Court.

3       Although Eisenberg listed/described 27 known signatures for the Goldberger report, some of the exemplar documents had 2 signatures on them.   Thus, Eisenberg used thirty-five (35) known Goldberger signatures for her Goldberger comparison.

supporting their forgery claims within this Court's deadlines.  (*See* Sixth Am. Case

Mgmt. Order & Scheduling Order [ECF Doc. No. 98] ¶ 5 (fixing Dec. 7, 2018 as date

for exchange of expert disclosures, including reports).)  Defendants did not even

bother to retain (or could not find) an expert to analyze the authenticity of the

original mortgage made available for Defendants' examination.

Finally, the Moving Parties claim, without any citation, that K-1 (better

known as the "Side Agreement"), used as one of 28 exemplars in the expert report for

Menczer's signature, is a "challenged" documents and should not have been used for

the signature comparison.  The Moving Parties then falsely claim that Eisenberg's

conclusion with respect to Menczer was based "solely" on this document.   They know

this is false – Eisenberg based her conclusion on her review and analysis of K-1

through K-28.  Indeed, when asked at her deposition whether the absence of K-1

would change her conclusion, she stated it would not. (Menasché Decl. Ex. A

(transcript of the deposition of Donna O. Eisenberg, held on December 17, 2018

(hereinafter, "Eisenberg Tr. __"), at 79:7-17.)   Thus, irrespective of whether K-1 was

a challenged document or not, Eisenberg's conclusion would have been the same:

Menczer probably wrote his signature on the Note.

While the Moving Parties offensively accuse Eisenberg of engaging in "smoke

and mirrors" in her reports and being a "hired gun," it is clear the Motion is a giant

exercise in the use of smoke and mirrors.   This Court should reject it.

## ARGUMENT

I.    FORENSIC DOCUMENT EXPERTISE IS RELIABLE AND ADMISSIBLE
AS "TECHNICAL, OR OTHER SPECIALIZED KNOWLEDGE" UNDER
RULE 702 OF THE FEDERAL RULES OF EVIDENCE.

As the Second Circuit has recognized, "[i]t is a well-accepted principle that

Rule 702 embodies a liberal standard of admissibility for expert opinions,

representing a departure from the previously widely followed, and more restrictive,

standard of *Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923)." *Nimely v.

City of New York*, 414 F.3d 381, 391 (2d Cir. 2005). The role of this Court it to serve

as the "gatekeeper" in "'mak[ing] certain that an expert, whether basing testimony

upon professional studies or personal experience, employs in the courtroom the same

level of intellectual rigor that characterizes the practice of an expert in the relevant

field.'" *Id.* (quoting *Khumo Tire Co.*, 526 U.S. at 152). The Expert Reports not only

provide Eisenberg's analysis but also her qualifications, identification of the twelve

cases in which she testified, including the U.S. District Courts of Maryland and the

Southern District of Florida, and *curriculum vitae*. Eisenberg has worked as a

forensic document examiner for the past twenty-eight years, plus an additional three

years as an apprentice. She has been employed by the Homeland Security Forensic

Laboratory and its predecessor agency, INS, as a forensic document examiner for

twenty-one (21) years and prior to this, was employed by the Secret Service, Forensic

Services Division for ten (10) years. She is certified by the American Board of

Forensic Document Examiners. With respect to her expert testimony, Eisenberg

confirmed that no court has ever held she did not qualify as an expert. (Eisenberg

Tr. 53:10-12 ("Q. Has the court ever held that you do not qualify as an expert? A. Never".)   Eisenberg is highly qualified and will employ in the courtroom at trial the level of intellectual rigor expected of forensic document examination experts in the field.

Moreover, while the Second Circuit Court of Appeals has not addressed directly the admissibility of handwriting analysis, *see United States v. Adeyi*, 165 F. App'x 944, 945 (2d Cir. 2006) ("Our circuit has not authoritatively decided whether a handwriting expert may offer his opinion as to the authorship of a handwriting sample, based on a comparison with a known sample."), district courts in this Circuit have routinely permitted forensic document examination experts to testify and provide expert reports. *See, e.g.*, *United States v. Starzecpyzel*, 880 F. Supp. 1027, 1047 (S.D.N.Y. 1995) ("The Court therefore finds sufficient indicia of reliability to sustain the admissibility of FDE expertise as nonscientific expert testimony."); *United States v. Tarantino*, 2011 WL 1113504, at *7-8 (E.D.N.Y. Mar. 23, 2011) ("Subject to *voir dire* of the analyst's expert qualifications, the Court will permit the analyst to describe for the jury the similarities and differences between the Defendant's exemplar and the handwritten notes."); *United States v. Brooks*, 2010 WL 291769, at *3 (E.D.N.Y. Jan. 11, 2010) ("[H]andwriting analysis is sufficiently reliable under *Daubert* and [FRE 702]."); *United States v. Jabali*, 2003 WL 22170595, at *2 (E.D.N.Y. Sept. 12, 2003) (citation omitted) ("Blanket exclusion [of handwriting analysis] is not favored, as any questions concerning reliability should be directed to weight given to testimony, not its admissibility.").   Indeed, the

{01003326.DOCX;5 }                                         6

Advisory Committee's notes to the Federal Rules of Evidence provide that experience is a basis for qualifying an expert, and specifically reference handwriting experts as an example of experts qualified based on such experience. Fed. R. Evid. 702, Advisory Comm.'s Note to 2000 Amendment, ¶ 11. There is no question Eisenberg is qualified, that she offers knowledge that is not within the common knowledge and experience of triers of fact, and there are sufficient indicia of reliability to permit the Expert Reports and her testimony to be considered by the fact finder.

To the extent the Moving Parties disagree with Eisenberg's expert opinion, the solution is not to prevent this Court from considering her report and hearing her testimony. The Moving Parties are free to test her opinion on cross examination, as noted by the Southern District of New York: "In any event, jurors are likely to divine a forensic document examiner's opinion as to genuineness from the thrust of the first stage testimony [i.e., the stage in which the forensic document examiner scrutinizes the genuine and challenged exemplars and identifies "significant" similarities and differences]. By permitting direct testimony as to that opinion, jurors may receive the benefit of a thorough cross-examination as to the basis for the opinion." *Starzecpyzel*, 880 F. Supp. at 1047. Indeed, the Moving Parties already took their first shot at this, deposing Eisenberg for over five hours, months ago. (*See generally* Eisenberg Tr.) What is apparent, after a review of her testimony, is that Eisenberg provided clear, detailed, and thorough answers regarding her qualifications, experience as a forensic document examiner, and her analysis of the signatures at issue.

Notwithstanding the admissibility of forensic document examination reports and testimony, opposing counsel makes the offensive and baseless statement that "[i]t is also obvious that Eisenberg's opinion is simply the one desired by those paying her fee." (Mot. 11.) This is particularly disingenuous because he tested this line of attack during her deposition and she clearly showed she is no hired gun. In fact, she indicated she will give opinions that are not helpful to those who hired her, if that is what the facts bear out. When Mr. Fleischmann asked whether Eisenberg had ever "issued a written report that is contrary to . . . the position of the person you were hired by," Ms. Eisenberg responded, "In those cases – the answer's no, I have not written a report. *It's a verbal – I give a verbal opinion*." (Eisenberg Tr. 51:4-17 (emphasis added).) In other words, after she performs her analysis, she communicates her conclusions based on her analysis of the evidence and, when it does not align with their theory of the case, they do not have her prepare a written report. The obvious inference is that she is not a hired gun who will say whatever an attorney wants her to say. Mr. Fleischmann knew this but disregarded this to disparage Eisenberg's reputation. This is unacceptable. Eisenberg is qualified.

## II.  THE EXPERT REPORTS IDENTIFIED AND DESCRIBED THE METHODOLOGY USED TO PROVIDE EISENBERG'S OPINION.

The Moving Parties, without basis, assert that "the critical elements of identifying the methodology used and conclusions based on the use of such methodology are both noticeably absent." (Mot. 3.) Plaintiff is left wondering whether the Moving Parties reviewed the Expert Reports with the requisite

attention to detail or intended to mislead the Court with this motion *in limine* by selectively quoting from Eisenberg's deposition. Before rendering an opinion, each of the Expert Reports contains a section addressing (i) an identification of the "Questioned Signatures," (ii) a description of the 28 "Known Signatures," and (iii) a detailed "Findings" section where there is a discussion of (a) the "individualizing characteristics" of each signature that Eisenberg reviewed and the (b) "habitually repeated similarities" exhibited by Menczer's and Goldberger's signature, as described in four separate addendums for Goldberger and five addendums for Menczer. For example, with respect to her analysis comparing Menczer's Questioned Signature with Known Signatures (provided by Menczer), Eisenberg states:

> Although comparison of the lower case letter forms was restricted, many other handwriting characteristics beyond letter formations were comparable. These characteristics include spacing, alignment, attention to baseline, initial strokes, pen lifts, size ratios, the angles of each letter, terminal strokes, speed and skill. All of these handwriting characteristics are in excellent agreement among the Exhibit Q1 and K1 through K28 signatures.
>
> Visual examples of some habitually repeated similarities exhibited within the Exhibit Q1 and K1 through K28 exemplars are demonstrated in the attached Addendums.
>
> Addendum A: Letter formations refer to the design of the written characters. A habit of Mr. Menczer is to write the letter "M" such that all of the pen movements comprising the letter are separate from one another; that is, no portion of any stroke within the 'M' is retraced.

(Menczer Expert Rep. 3-4.) That is only an excerpt of one report, but it illustrates

that Eisenberg indeed detailed findings and analysis and explained her observations and methodology.   The Moving Parties simply do not like her conclusions.

The Moving Parties make a great deal out of the fact that, at her deposition, Eisenberg stated for the first time that her methodology is guided by the standards set forth by the Scientific Working Group for Forensic Document Examination ("SWGDOC"), which is also something she repeats in her trial testimony declaration. They claim that because the Expert Reports do not mention SWGDOC and do not state those guidelines in detail, the Expert Reports are somehow deficient and should be precluded from trial.   This is simply untrue and, unsurprisingly, the Moving Parties cite no support for this argument.   Just as an accounting expert opining on a revenue recognition issue is not expected to restate all of GAAP's guidelines or attach a full copy of the GAAP rules governing revenue recognition to his or her report, Eisenberg need not delineate the SWGDOC guidelines in her report.   She need only articulate her analysis, which adheres to those guidelines.

That said, to the extent that the Expert Reports should have mentioned SWGDOC (a point Plaintiff does not concede), Eisenberg addressed this point by answering all of Mr. Fleischmann's questions concerning SWGDOC at her deposition and producing a copy of the guidelines to him. He was free to review them and question her on them during the deposition if he thought such testimony would be necessary:

> Q.    Do you know if there's any literature supporting the method you used?

A.    Yes.

Q.    What is it?

\* \* \*

THE WITNESS:    No.    It's called SWGDOC, and it's methodology, and I just brought other documents for another kind of trial on Wednesday; so, I brought those documents . . . So you are welcome to look – to make a copy. But this SWGDOC is the, um, Scientific Working Group for Documents and they have rules and regulations that I follow.    And the one – I'm going to give you all three.    You can have a copy.    One is minimum training requirements for forensic document examiner.    The other is standard terminology for expressing conclusions of forensic document examiners.    And then the third one is standard for examination of handwritten items.

Q.    Thank you.

A.    Those are the standards and methodology that document examiners abide by.

(Eisenberg Tr. 62:2-63:14.)    In the Motion, the Moving Parties selectively omitted the full answers Eisenberg gave on these issues to create the false impression that the Expert Reports did not fully disclose her methodology.    For example, the Motion sets forth the following question and answer as if it were the entire colloquy:

Q.    Does your report recite every step taken by you to reach or your conclusion or opinion?

A.    No.

Q.    So I'm asking:    What is not in there?    What is not recited?

A.    . . . And I don't reference SWGDOC definitions in my report.    I'm using them but I don't reference them.

(Mot. 4 (quoting Eisenberg Tr 64:13-16) (emphasis added).)   But the ellipsis omits material aspects of Eisenberg's answer.   The <u>full</u> and <u>non-misleading</u> answer follows:

> Q.   Does your report recite every step taken by you to reach or your conclusion or opinion?
>
> A.   No.
>
> Q.   Okay.   What is missing?
>
> MR. RINGEL:   I'm going to object to the question. But you can answer it.
>
> A.   *I don't know what you mean.*   Him reading the same question's not going to explain to me what you mean.
>
> Q.   Okay.   So I asked you if 'the report recites every step taken by you to reach your conclusion or opinion, correct?'   And you said, 'No.'   So I'm asking:   what is not in there?   What is not recited?
>
> MR. RINGEL:   Just note my objection to the question.
>
> A.   So *in my report, I list everything, and then I explain my – I give my findings.   And then I explain, uh, basically, how I reach my findings.*   And I don't reference SWGDOC definitions in my report.   I'm using them, but I don't reference them.   Does that answer your question?
>
> Q.   Is there anything else?
>
> A.   I don't think so.
>
> Q.   So other than what you just said, there are no steps that are omitted from your report, correct?
>
> A.   Correct.
>
> Q.   Is your report specific enough that another expert in

the same field could duplicate your results?

A.    Yes.

Q.    *Does your report contain complete statements of the basis and reasons for your opinion?*

A.    *Yes.*

Q.    Were there any false trails or abandoned approaches?

A.    No.

Q.    Is there anything in the report concerning your opinion that you would want to change or revised?

A.    No.

(Eisenberg Tr. 64:13-66:13 (emphasis added).)

As the Court can see, Eisenberg stated she listed <u>everything</u>, that she used the SWGDOC definitions (even if she did not quote them outright), and that another expert in the field could duplicate her results.  Mr. Fleischmann conveniently failed to mention any of this.  Eisenberg's deposition testimony on SWGDOC and her descriptions of her methodology only strength the fact that her testimony is relevant and reliable to the trier of fact.  *See, e.g., Travelers Prop. & Cas. Corp. v. GE*, 150 F. Supp. 2d 360 (D. Conn. 2001) (court admitted expert testimony despite "woefully inadequate" expert report and deposition testimony because *Daubert* hearing established methodology and basis for opinion).  And interestingly, nowhere in the Motion do the Moving Parties actually attack the SWGDOC guidelines or the methodology itself.  Moreover, Defendants cannot claim prejudice or surprise from

the SWGDOC guidelines not being included in the report because Eisenberg expressly mentioned the guidelines, and Defendants had an opportunity to review the guidelines and question her about them at her deposition.    Notably, Defendants' counsel did not seek a break during the deposition or a continuance of the deposition to review the guidelines.    Eisenberg was not even deposed for the full seven hours permitted under the Federal Rules of Civil Procedure.

**III.    THE FACT THAT EISENBERG DID NOT AUTHENTICATE THE NOTE AND THE MORTGAGE IS IRRELEVANT TO THE ADMISSIBILITY OF HER TESTIMONY.**

Surprisingly, the Motion spends five pages arguing the fact that Eisenberg's testimony and report should be precluded from trial because she did not authenticate the Note and the Mortgage.    This point is irrelevant, as Eisenberg's expert opinion is not proffered to prove the ultimate issue of whether the Note and the Mortgage are authentic.    That, respectfully, is the issue for this Court, not for an expert.    With respect to authentication, Plaintiff expects to present substantial other documentary and testimonial evidence to establish existence of the debt to Plaintiff and execution of the Note and Mortgage being foreclosed upon in this action. Eisenberg's expert opinion is limited to signatures, not authentication of the documents.    Her opinion is offered to assist the trier of fact in determining whether Goldberger's and Menzcer's known signatures match the signatures on the Note and the Mortgage.    And, as Eisenberg concluded, she was able to state her opinion that, after making a comparison between the questioned signatures and the known signatures, she found (i) an identification of Goldberger as the writer of the signature on the Note and the

{01003326.DOCX;5 }                            14

Mortgage and (ii) Menczer "probably wrote" the signature on the Note.

Mr. Fleischmann questioned Eisenberg at her deposition, where she made clear the appropriate limitations of her opinion:

> Q.    Remember I asked you before about the authenticity of the documents?
>
> A.    Yes.
>
> Q.    Are you opining on that?
>
> A.    I wasn't asked to – that wasn't my assignment.
>
> Q.    Sure.   So you're not opining on that, correct?
>
> A.    Yes, that's correct.

(Eisenberg Tr. 66:17-67:2.)    Given that opposing counsel has already explored this line of questioning at the deposition, the point of this argument is entirely unclear.   The Moving Parties state that Eisenberg cannot authenticate the Note and the Mortgage and Plaintiff does not argue she can or should.   Plaintiff expects that the Court will evaluate Eisenberg's testimony with respect to the signatures and will rely on the evidence it presents at trial to reach the conclusion that the Note and the Mortgage are authentic.   Taken together, Plaintiff expects the ultimate conclusion to be that the Note and the Mortgage are fully enforceable against Defendants.

## IV.    THE MOVING PARTIES FALSELY CLAIM THAT EISENBERG'S CONCLUSIONS WITH RESPECT TO MENCZER'S SIGNATURE ARE BASED SOLELY ON CHALLENGED WRITINGS; THEY ARE NOT.

The Moving Parties falsely claim that Eisenberg's opinion with respect to Menczer's signature on the Note hinges on her comparison between Menczer's

Questioned Signature ("Q-1") and K-1 (the Side Agreement), which is an exemplar they purport is a "challenged writing." (Mot. 10.)    This is false.    First and foremost, the expert report for Menczer compares <u>twenty-eight (28) different exemplars</u> to the Q-1 signature in reaching the conclusion that Menczer "probably wrote" the signature.    For example, the fourth paragraph of the expert report for Menczer's signature details how <u>all</u> the exemplars were in "excellent agreement" with Q-1 and used to reach the ultimate conclusion:

> Although comparison of the lower case letter forms was restricted, many other handwriting characteristics beyond letter formations were comparable.    These characteristics include spacing, alignment, attention to baseline, initial strokes, pen lifts, size ratio, the angles of each letter, terminal strokes, speed and skill.    *All of these handwriting characteristics are in excellent agreement among the Exhibit Q1 and K1 through K28 signatures.*

(Menczer Exp. Rep. 4 (emphasis added).)    It is bizarre then that the Motion ignores this paragraph, as well as Eisenberg's testimony, and falsely states that K2 through K28 are "completely different" (Mot. 11) from Q-1.

Indeed, at Eisenberg's deposition, opposing counsel probed whether K-1 was an essential document to her conclusion and she confirmed it was not:

Q.    How do you know that K-1 is a known signature versus a questioned signature?

A.    It was told to me.

Q.    If I were to tell you that K-1 is a questioned signature, would that affect your analysis in any way?

A.    In fact, it would not.

Q.    It would not?

A.    *No.   Because I have so many other exemplars.*

(Eisenberg Tr. 79:7-17 (emphasis added).)   Nevertheless, the Motion ignores the

many ways the 28 exemplars were compared to the Questioned Signature, focusing

only on the fact that the expert report for Menczer acknowledged that both Q-1 and

K-1 had an "abbreviated design" (as opposed to the other signatures that did not).

(*See* Mot. 10.)   When asked about this point at her deposition, Eisenberg again

corrected opposing counsel's misinterpretation of her findings:

Q.    And K-1 and Q-1 are most similar to each other,

correct?

A.    Uh, only – I don't agree with that.   Only with
respect to how abbreviated they are.

Q.    In other words the abbreviated J and M are not
typical in the other samples, correct?

A.    I disagree with that.

(Eisenberg Tr. 82:6-14.)   Thus, it is clear that Eisenberg's conclusion with respect to

Menczer's Questioned Signature is not dependent solely on K-1 at all.   In fact,

Eisenberg would have reached the same conclusion that Menczer probably wrote his

signature on the Note if she had not reviewed K-1 at all.   To the extent there was

any error in including this document with the other exemplars, the error was

harmless and did not affect the ultimate opinion.

## CONCLUSION

Respectfully, for all of the foregoing reasons, this Court should deny the

Motion in its entirety.

Dated:  New York, New York
April 29, 2019

ROBINSON BROG LEINWAND GREENE
GENOVESE & GLUCK P.C.

By: /s/ Fred B. Ringel
Fred B. Ringel, Esq.
William A. Rome, Esq.
Nicholas M. Menasché, Esq.

875 Third Avenue, 9th Floor
New York, New York 10022
Telephone: (212) 603-6300
Facsimile: (212) 956-2164

*Attorneys for Plaintiff Broadway Equity
Holdings LLC*