UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------------------------------------x
In re:

                                         Chapter 11

BROADWAY EQUITY HOLDINGS LLC,

                                         Case No. 17-22242 (RDD)

                             Debtor.
----------------------------------------------------------------------x
BROADWAY EQUITY HOLDINGS LLC,

                                Plaintiff,                 Adv. Pro. No. 17-8215

        -against-

152 BROADWAY HAVERSTRAW NY LLC, BLUE
BEVERAGE GROUP, INC., JOSEPH GOLDBERGER,
TOBY WEINBERGER, MFT HOLDINGS LLC, ESTATE OF
JENO GUTTMAN, RYVKIE GOLDBERGER, VILLAGE OF
HAVERSTRAW RECEIVER OF TAXES, COMMISSIONER
OF FINANCE OF THE COUNTY OF ROCKLAND, NEW
YORK STATE DEPARTMENT OF TAXATION AND FINANCE,
"JOHN DOE NO. 1" through "JOHN DOE NO. 10",
and, said names being fictitious, it being the intention
of Plaintiff to designate all persons, partnerships,
corporations, or other entities in possession of the
premises as tenant or otherwise any/or all other
persons or entities having or claiming an interest in
said premises,

                              Defendants.
----------------------------------------------------------------------x
152 BROADWAY HAVERSTRAW NY LLC, BLUE BEVERAGE
GROUP, INC., JOSEPH GOLDBERGER,
and JOSEPH MENCZER,

                            Counterclaim Plaintiffs,

        -against-

BROADWAY EQUITY HOLDINGS LLC, JOEL
WERTZBERGER a/k/a JOEL WURTZBERGER,
ARON WOLCOWITZ a/k/a ARON JACOB
WOLCOWITZ a/k/a JACK WOLKOWITZ and

1

JUDY MINSTER,

Counterclaim Defendants

-----------------------------------------------------------------------x

**MEMORANDUM OF DECISION AFTER TRIAL**

Appearances:

Robinson Brog Leinwand Greene Genovese & Gluck P.C., by Fred B. Ringel, Esq., counsel for Plaintiff and Counterclaim Defendant Broadway Equity Holdings LLC

Rubin LLC, by Paul A. Rubin, Esq., counsel for Counterclaim Defendants Joel Wertzberger, Aaron Wolcowitz, and Judy Minster *nee* Wolcowitz

Backenroth Frankel & Krinsky, LLP, by Abraham Backenroth, Esq., and Law Office of Jeffrey Fleischmann PC, by Jeffrey Fleischmann, Esq., joint counsel for Defendants with the exception of Village of Haverstraw Receiver of Taxes, Commissioner of Finance of the County of Rockland, New York State Department of Taxation and Finance, and John Does No. 1 through No. 10, as well as for Counterclaim Plaintiffs 152 Broadway Haverstraw NY LLC, Blue Beverage Group, Inc., Joseph Goldberger, and Joseph Menczer

Hon. Robert D. Drain, United States Bankruptcy Judge

In this adversary proceeding the debtor and debtor in possession, Broadway Equity Holdings LLC ("Broadway Equity" or the "Plaintiff") seeks to enforce a note in the sum of $6 million, plus interest, costs and expenses of enforcement, including attorneys' fees, issued jointly by defendants 152 Broadway Haverstraw NY LLC ("152 Broadway") and Blue Beverage Group, Inc. ("Blue Beverage," with 152 Broadway, the "Borrowers") and to foreclose on a mortgage on real property located at 152 Broadway, Village of Haverstraw, Town of Haverstraw, County of Rockland, New York, Tax Map Designation:  Section 27.5 Block 2 Lot 1 (the "Property") granted by 152 Broadway to secure such debt.

In addition, Plaintiff asserts that the Borrowers, one of their principals, defendant Joseph Goldberger ("Goldberger"), and defendants Toby Weinberger, MFT Holdings LLC, the estate of Jeno Guttman, and Ryvkie Goldberger (the "Confession of Judgment Creditors"), who

2

are relatives or other insiders of Goldberger or the Borrowers' other principal, Joseph Menczer

("Menczer") caused the Borrowers (a) to enter into false confessions of judgment with the

Confession of Judgment Creditors, which were then recorded with the Clerk of Rockland

County, New York, and (b) to record a "Correction Mortgage" with the Clerk of Rockland County

without Plaintiff's agreement that purported to alter the terms of Plaintiff's mortgage on the

Property and to make it junior to the liens on the Property arising from the filing of the

confessions of judgment.  Plaintiff seeks (a) a declaratory judgment that the Correction

Mortgage is of no force or effect, that it be vacated and that the confessions of judgment be

declared junior to the Plaintiff's mortgage, and (b) damages from Goldberger and the

Confession of Judgment Creditors for the allegedly fraudulent filings and scheme to place

themselves ahead of the Plaintiff's secured debt.[1]

The Borrowers, Goldberger and the Confession of Judgment Creditors assert various

defenses, discussed below, the chief of which is that the Borrowers never agreed to Plaintiff's

note and mortgage, and Goldberger and Menczer's signatures on behalf of the Borrowers were

forged.  Additionally, the Borrowers, Goldberger and Menczer (the "Counterclaim Plaintiffs")

assert that Plaintiff and counterclaim defendants Joel Wertzberger ("Wertzberger"), Aaron

Wolcowitz ("Wolcowitz") and Judy Minster *nee* Wolcowitz (with Plaintiff, the "Counterclaim

Defendants") by engaging in the "complete and absolute fraud" of seeking to enforce the

Plaintiff's note and mortgage, are liable to 152 Broadway for slander of title and should be

barred from asserting an interest in the Property.  Finally, the Counterclaim Plaintiffs assert a

---

[1] See generally Amended Complaint, dated June 15, 2017, which is the parties' Joint Exhibit ("JE") 1.  Other causes of action in the Amended Complaint were dismissed by this Court's Order dated October 18, 2017.

claim against Wolcowitz for notarial misconduct, alleging that he improperly notarized the

Plaintiff's allegedly forged note and mortgage.[2]

This is strong stuff, with the Plaintiff alleging the fraudulent scheme of the confessions

of judgment and Correction Mortgage and the Counterclaim Plaintiffs alleging forgery of the

Plaintiff's note and mortgage and fraud in recording the mortgage and seeking to enforce it.

The other named defendants have not contested Plaintiff's foreclosure on the Property.

Fairly late in this adversary proceeding, a new wrinkle appeared when the Borrowers

commenced their own cases under chapter 11 of the Bankruptcy Code.  Although they

consented to modification of the automatic stay under 11 U.S.C. § 362(a) to permit this

adversary proceeding to proceed,[3] they sought to preserve causes of action that their estates

might possess to avoid Plaintiff's mortgage and note as fraudulent transfers under 11 U.S.C. §

544(b) and to equitably subordinate Plaintiff's claim and compel the transfer of its mortgage to

152 Broadway's chapter 11 estate under 11 U.S.C. § 510(c).  The ability to preserve such rights

was discussed at the start and close of the trial[4] and in post-trial briefing.

The Court held a three-day bench trial, taking the testimony and evaluating the

credibility of several witnesses, including the key players, and has considered all exhibits

admitted into evidence and the parties' post-trial submissions.  This Memorandum of Decision

explains why Plaintiff is entitled to judgment on its note and mortgage and against the

---

[2] See generally Answer and Counterclaims, dated October 26, 2017. JE 2.  Other counterclaims were dismissed by the Court's Order dated March 8, 2018.  Notwithstanding the Court's prior prior ruling, the Borrowers continued at trial to try to establish that Broadway Equity did not actually lend them any money and that, instead,  Broadway Equity or Wertzberger simply made capital contributions to them; but the note, if genuine, memorializes the obligation to Broadway Equity, and no one has alleged insufficient consideration to support entry into the note.
[3] Trial Transcript, May 1, 2019 ("5/1 Tr.") at 6-7.
[4] Id.; Trial Transcript June 25, 2019 ("6/25 Tr.") at 112-14.

Borrowers, Goldberger and the Confession of Judgment Creditors for entering into and causing the filing of the confessions of judgment and preparing and causing the filing of the Correction Mortgage.  The facts clearly belie the Counterclaim Plaintiffs and Confession of Judgment Creditors' allegations of forgery.  Indeed, in making such allegations Goldberger and Menczer likely committed perjury; in any event, their testimony was consistently lacking in credibility, at times almost breathtakingly so.  It is also clear that Goldberger caused the Borrowers to enter into and file false confessions of judgment and a Correction Mortgage with terms never agreed by Plaintiff.  Thus they damaged Plaintiff, and 152 Broadway had no title that was free of Plaintiff's mortgage to slander.  The Counterclaim Plaintiffs also failed to establish their notarial misconduct claim against Wolcowitz.  Accordingly, each counterclaim against the Counterclaim Defendants should be dismissed.

This Memorandum also explains why, notwithstanding the Borrowers' full participation in the trial, the foregoing rulings should not bind their chapter 11 estates with respect to causes of action under 11 U.S.C. §§ 544(b) and 510(c), although Goldberger, Menczer and the Confession of Judgment Creditors will be bound by this decision in all respects, including preclusion from benefitting from such causes of action if they ever are brought and established.

### Jurisdiction

The Court has jurisdiction under 28 U.S.C. §§ 157(a)-(b) and 1334(b) over the claims and counterclaims in this adversary proceeding, which, because they concern the Plaintiff's primary assets, are clearly "related to" this chapter 11 case.  The parties knowingly and voluntarily

consented to the Court's final determination of such claims.  Wellness Int'l Network, Ltd. v.

Sharif, 135 S. Ct. 1932, 1946-48 (2015).[5]

### Discussion

**Background.**  Blue Beverage owned a commercial bottling business located at the

Property,[6] and it and 152 Broadway were owned by Goldberger and Menczer.  These men

sought support for the business in the light of its poor financial condition and ultimately to sell

their interests in the Borrowers.[7]  They therefore entered into the December 26, 2012

Commitment to Sell Contract with Wertzberger and Wolcowitz, discussed at footnote 5 and

appearing at JE 19.  Under that agreement, Wertzberger and Wolcowitz were to purchase

Goldberger and Menczer's interests along with all the Borrowers' property, including the

Property, subject to preexisting liens, or, at the purchasers' option, only half of such interests

and property.  JE 19 ¶¶ 1-11, 18.  The purchasers had two years to pay 60 percent of the

purchase price (for all of the property), with the remainder to be paid over four years, with

interest.  Id. ¶¶ 12-16.  However, immediately upon execution of the agreement the purchasers

were appointed managers of the Borrowers "as if the entire business was his[8] and the

---

[5] In a separate "Commitment to Sell Contract" dated December 26, 2012 between Wertzberger and Wolcowitz, on the one hand, and Goldberger and Menczer, on the other, pertaining to Wertzberger and Wolcowitz's agreement to purchase Goldberger and Menczer's ownership of Blue Beverage and the assets used in its business, including the Property owned by 152 Broadway, those parties agreed to arbitrate their disputes related to such contract and sale before a rabbinical court, or *beis din*. JE 19 at ¶ 52.  The Court previously ruled, however, that the present dispute, involving the Plaintiff's enforcement of its note and mortgage, is not subject to that agreement, to which the Plaintiff was not a party.   Hearing Transcript, June 6, 2017 ("6/21 Tr.") at 86.

[6] The Property apparently is 152 Broadway's only real property asset.  152 Broadway Petition, Case No. 19-22834, *Schedule A/B*.

[7] Declaration of Joseph Menczer, dated April 17, 2019 ("Menczer Decl.") ¶¶ 6-7.  Under the Court's pre-trial order, the Menczer Decl. served as Menczer's direct testimony.

[8] Under the agreement, Wertzberger and Wolcowitz, whom I have been referring to as the "purchasers," are designated in the singular as "Party B," Goldberger and Menczer being designated as "Party A."  The agreement states that the two purchasers "comprising Party B are not equal partners; rather, it is all in accordance with an agreement between them."   JE 19 Preamble.  The evidence established that, as between the purchasers,

investment was his alone." Id. ¶ 21, 33-40. Pending the purchase, the purchasers also assumed the cost of funding the Borrowers, up to $4.8 million, and were authorized also to cause the Borrowers to incur debt and grant a mortgage on the assets, including the Property. Id. ¶¶ 17, 28-30.[9]

About 18 months into this arrangement, the purchase still not having occurred and the Borrowers in continuing need of financial support beyond the $4.8 million committed under the Commitment to Sell Contract and other funds advanced, Wertzberger sought to obtain a note and mortgage for the funds he had caused to be invested in the Borrowers, as well as liens on the Borrowers' assets as security therefor.[10] Plaintiff was denominated as the loan vehicle for various people and entities related to Wertzberger who had provided such funds.[11] Wertzberger retained a lawyer, Mark Kranz to assist with the documentation, and Kranz interacted with the lawyer retained by Goldberger and Menczer on behalf of the Borrowers, Barry Feerst.[12] The business discussion over the proposed note and liens proceeded in tandem with discussions between Goldberger and Menczer and Wertzberger regarding the conditions for Wertzberger and Wolcowitz's continued support of the Borrowers.[13]

The note and security documents progressed from early July to early September 2014, with Kranz and Feerst exchanging drafts copied to their clients. JE 7-10. By early September,

---

Wolcowitz primarily had the operational role while Wertzberger primarily had the financial and negotiating role in the transaction with Goldberger and Menczer. 5/1 Tr. at 149-50, 162 (Wolcowitz); Declaration of Joel Wertzberger, dated April 17, 2019 ("Wertzberger Decl.") ¶¶ 23; Declaration of Aron Wolcowitz, dated April 18, 2019 ("Wolcowitz Decl.") ¶¶ 17, 19. The Wertzberger Decl. and Wolcowitz Decl. served as their direct testimony under the Court's pre-trial order.

[9] As noted, the parties disagree whether this funding was to be in the form of equity or debt, but the note at issue, if genuine, confirms the debt.

[10] 5/1 Tr. at 51-52 (Wertzberger); Menczer Decl. ¶ 20; Wolcowitz Decl. ¶ 23.

[11] Wertzberger Decl. ¶ 20; 5/1 Tr. at 50-53, 57 (Wertzberger).

[12] 5/1 Tr. at 25-26 (Kranz); Trial Transcript, June 24, 2019 ("6/24 Tr.") at 42 (Feerst).

[13] 6/25 Tr. at 15 (Goldberger).

there appeared to be no remaining issues with the documents, 5/1 Tr. at 25 (Kranz), although Wertzberger and Wolcowitz were concerned that Goldberger and Menczer would not ultimately agree to them.[14]  These fears proved valid; indeed, Goldberger and/or Menczer had instructed Feerst to slow walk the documents and put other obstacles in the way of the deal.[15]

It appears that by the beginning of September, however, Goldberger and Menczer were pretty well backed into a corner;[16] one reasonably infers that their hope to retain Wertzberger and Wolcowitz's continued support for the Borrowers depended on the Borrowers executing the documents.  A meeting was scheduled for September 4, 2014 for that purpose.[17]  According to Feerst, even then Goldberger and Menczer were doing what they could to avoid actually closing.  As Feerst testified, he agreed with Goldberger to string on Kranz and the purchasers as long as possible and perhaps cause the closing not to happen,[18] at which he almost succeeded, or, rather, partially succeeded.

It should be noted that while Feerst engaged in what may still be referred to as "sharp practice" with Kranz, and while testifying was often evasive, his testimony to the extent it went against the interests of his clients was credible, especially when he was pressed on cross and in the light of his and others' deposition testimony or the audio recordings discussed below. Ultimately, Feerst was not prepared to risk committing perjury for his clients, although if given an escape route he was quick to take it.  Kranz was a credible witness in all respects.

---

[14] 5/1 Tr. at 59, 70 (Wertzberger), 162 (Wolcowitz).
[15] 6/24 Tr. at 43-49 (Feerst), 109-10, 114-16 (Menczer).
[16] Id. at 108 (Menczer).
[17] 5/1 Tr. at 15-16 (Kranz).
[18] 6/24 Tr. at 45, 48-49 (Feerst); see also id. at 114-16 (Menczer).

**The September 4, 2014 Closing and Forgery Allegation**.  The parties agree that

Wertzberger, Goldberger, Menczer and Feerst met at Feerst's office in the late afternoon and

into the night of September 4, 2014, with the evident purpose (though at times Menczer and

Goldberger have denied even that) of trying to finalize and close on the Borrower note and

related security documents drafted over the preceding weeks.  One of Goldberger's sons also

was present for some of the meeting but does not seem to have played a role and did not

testify.  Kranz had another commitment but was available by telephone and, as discussed

below, participated telephonically at an important moment.

The parties disagree whether Wolcowitz attended the meeting.  It is an important point,

because, with Feerst having announced that his notaries had gone home for the night,[19] all

agree that no one attempted to notarize the documents that Wertzberger took away from the

meeting until Wolcowitz did so a few days later.  Wolcowitz and Wertzberger testified that

Wolcowitz arrived late but in time to see the execution of the note by Menczer and Goldberger

and the mortgage by Goldberger.[20]  Menczer testified that Wolcowitz was not there.[21]

Apparently concerned by how badly Menczer's testimony had gone the day before, on the eve

of his cross examination Goldberger withdrew his direct testimony (which, under the Court's

pre-trial order, was by declaration under penalty of perjury), including his statement that

Wolcowitz was not present.[22]

---

[19] 5/1 Tr. at 94 (Wertzberger).
[20] Id. at 66-67 (Wertzberger), 152-54, 163, 178-79 (Wolcowitz).
[21] Menczer Decl. ¶ 35.
[22] 6/25 Tr. at 11-12.  Nevertheless, Plaintiff called Goldberger to testify in rebuttal, but Goldberger did not then address whether Wolcowitz attended the September 4, 2014 meeting.

Wolcowitz and Wertzberger's testimony on this point, like their testimony generally, was credible. Menczer's testimony, consistent with his testimony generally -- which was repeatedly contradicted by the credible testimony of others, by documents in evidence and by his own statements, as well as being transparently self-serving and, when he was pressed during cross, evasive -- was not credible. I find that Wolcowitz was in fact present at the September 4, 2014 meeting and observed the execution of the mortgage at issue by Goldberger and the note at issue by Goldberger and Menczer, both of whom were indisputably known to him.[23]

It is well recognized that the testimony of interested witnesses such as Menczer, is insufficient to rebut the presumption of the validity of a notarization, which instead can be accomplished only by clear and convincing evidence. See e.g., Genger v. Arie Genger 1995 Life Ins. Trust, 84 A.D.3d 471, 471-72, 922 N.Y.S.2d 347 (1st Dep't 2011); see also Olympus Servicing L.P. v. Lee, 56 A.D.3d 537, 538, 867 N.Y.S.2d 196 (2d Dep't 2008). Nevertheless, even if the burden of proof as to Wolcowitz not having witnessed the signatures was by a preponderance of the evidence, the Counterclaim Plaintiffs would not sustain it.

I also find that at the September 4, 2014 meeting Goldberger signed the mortgage on behalf of 152 Broadway and that Goldberger and Menczer signed the note on behalf of the Borrowers. None of those signatures was forged.

---

[23] The Counterclaim Plaintiffs produced records showing that an EZ Pass card registered to Wolcowitz was used at a time indicating he could not have attended the meeting. Wolcowitz credibly testified, however, that this was one of multiple EZ Pass cards in his name and that he had previously provided it to an employee of Blue Beverage who needed one right away to commute to work. 5/1 Tr. at 152-61, 177-78 (Wolcowitz).

There are multiple reasons for this finding.  The executed note and mortgage, which appear at Ex. Q, have minimal changes from the previously circulated drafts, comprising handwritten reductions of the default interest rate from 24 percent to 20 percent.  This is consistent with the audio recording of a telephone conversation[24] between Feerst and Kranz during the meeting, in which Feerst states, with Wertzberger and Goldberger in earshot,[25]

> There's been an agreement on a reduction of the default rate I'm told, I'm told.  There's been an agreement on the elimination of certain receivables from the ambit of the secured interest that you've got.  Certain papers have to be changed, if I'm getting correct information.  What I'm proposing now is simple.  I want to give your client a signed promissory note.  I want to give him a signed mortgage.

To which Kranz responded,

> Yeah, you got cut off for just a second.  You said the signed promissory note and . . . then, then . . .

To which Feerst replies,

> The signed mortgage with the handwritten changes in the default rate.  Let him walk out.  I'll finish the papers by Monday, maybe sooner.  There's no way I'm going to make the changes that have to be made.  And I gotta delete Norman Seidenfeld from your opinion letter and there may be some other crap.  I'm not being evasive with you, but I want to make sure the papers that I give my clients are signed, what they intend to sign.  That's the bottom line.

After some irrelevant discussion about the opinion letter, Feerst concludes as follows:

> Anyway, that's the bottom line.  Speak to your client.  I hope privately, publicly, put it on the internet, I don't care what you do, but that's what I'm doing with him in the next two minutes.  I'll cross out, get him to sign papers,[26] and then he can leave or not leave.  I'm not saying that in a negative way or in a way that says to him get off my property and get out of here.  I gotta work on these papers a little bit and finish what needs to be finished, so I'm going to give him over to you.  Hold on.

---

[24] The transcript of this recording is Ex. H.

[25] Ex. H at 1; 6/25 Tr. at 20-21 (Goldberger).

[26] Feerst testified that the signor he was here referring to was Goldberger.  6/24 Tr. at 97 (Feerst).

Ex. H.

This is not consistent with the actions of parties who believed they had major remaining

points of disagreement, as Menczer and Goldberger claimed but the Court found not to be

credible testimony.[27]

It is possible that Feerst was playing more of his delaying game with Kranz on the

telephone, and indeed he never got around to sending Kranz the remaining security documents

that would have granted a lien on Blue Beverage's personal property, including receivables, as

he said he would.  But Feerst further corroborated that he did, in fact, give Wertzberger the

fully executed note and mortgage with handwritten changes as to the default interest rate,

appearing at Ex. Q, to walk away with from the meeting when he testified that he recognized

his signature witnessing Goldberg's signature on the mortgage.[28]

Feerst testified, moreover, that he recognized his signature witnessing yet another

document, appearing at the end of Ex. Q, that was executed at the meeting[29] and was also

signed by Goldberger, Menczer and Wertzberger.[30]  It is dated by hand "9/4/14" and states in

relevant part,

---

[27] See, e.g., 6/24 Tr. at 118-19, 124 (Menczer testifies that only shares in the Borrowers were meant to be transferred, yet cannot explain why the documents exchanged before and at the September 4, 2014 meeting involved a note, mortgage and security agreements, rather than shares, other than to say, at 118, "I really don't know how you do shares.  I don't know how you do shares.  I wasn't involved in such a process.  This is why I take a lawyer.").

[28] .Id. at 56.  Feerst equivocated to some extent that it "might" be his signature, id, and later equivocated more when led by Goldberger's counsel, id. at 92-94, but until that moment, the defendants had not suggested that *Feerst's* witnessing signature was not genuine.  In any event, the Court found his equivocation dubious.  Id. at 95 (the Court).

[29] Id. at 98-99, 109 (Feerst).

[30] Feerst testified that "I would not have signed as a witness for anybody who did not sign in front of me."  Id. at. 56. Menczer testified that he had not signed this document, and when informed of Feerst's testimony stated, "Could be he signed it.  I did not sign this document." Id. at 126 (Menczer). The Court does not believe him.

WHEREAS Joseph Goldberger and Joseph Menczer have on this day
executed a series of documents including a promissory note and security devices
pertaining thereto all of which established their indebtedness to Broadway
Equity Holdings, LLC arising out of the business activities of Blue Beverage Corp.

In addition to the foregoing testimony and exhibits, Plaintiff also offered an expert

opinion that (a) "the writer of the known [comparator] Exhibit K1 through K28 signatures,

Joseph Menczer, probably wrote the 'Joseph Menczer' signature on the [note]" and (b) "the

writer of the known [comparator] Exhibit K1 through K27 signatures, Joseph Goldberger, wrote

the 'Joseph Goldberger' signatures on the [note and mortgage.]"  Expert Declaration of Forensic

Document Examiner Donna O. Eisenberg ¶¶ 17 and 19.  Ms. Eisenberg is a highly qualified,

board certified forensic document examiner with specialized training in handwriting analysis.

She is a full-time employee at the Forensic Laboratory of the Department of Homeland Security,

Immigration and Customs Enforcement, having previously worked as a forensic document

examiner at the Forensic Services Division of the Department of Treasury, U.S. Secret Service

from 1988 to 1998.  She also operates a private forensic document examination business and

has been retained by the Public Defender's Office in Maryland and Delaware and in many

private engagements.  Hers was a model of credible expert testimony.[31]  The Counterclaim

Plaintiffs offered no expert testimony either directly in support of their forgery allegations or in

rebuttal.

Moreover, at a later meeting, also recorded,[32] Goldberger and Menczer actually

acknowledged they signed the note and arguably admitted the same as to the mortgage.  This

meeting, between Goldberger, Menczer and Wertzberger, with Wolcowitz coming in for part of

---

[31] Id. at 29-37(Eisenberg).
[32] At the meeting the parties spoke in Hebrew.  The translated transcript appears at Exhibit J.

it, occurred on December 14, 2014 as the extension of the two year period for paying the

purchase price under the Commitment to Sell Contract was coming to an end and the parties

were negotiation the circumstances under which the purchasers would stay involved with the

Borrowers, even if just for an extended transition period.[33]  The transcript of this meeting well

illustrates Goldberger and Menczer's propensity to duck, obfuscate and otherwise perform

negotiation jiu jitsu.  If nothing else, it further belies Goldberger and Menczer's already

incredible protestations that they were naïve about business matters and would not have

understood or agreed to the legal effect of documents they signed, if they in fact signed them.[34]

At page 15 of the December 14, 2014 meeting transcript, Wertzberger states, "Yeah,

you already gave me the mortgage, it's just that you didn't sign the security agreements,"[35] to

which Menczer replies, "Bentzy" (Goldberger's son)[36] "and Yechiel (Goldberger's first name in

Hebrew)[37] pushed me to do it, and I was about to marry off, and they pushed me so hard until I

---

[33] 5/1 Tr. at 57 (Wetzberger); Ex. J at 1-3 (Goldberger and Menczer suggest that with a little more time and support by the purchasers, third parties will pay them out), 14-15 (Wertzberger wants to finalize all documents (presumably the other security agreements that Feerst never delivered) and get shares, saying he already has a note and mortgage), 42-43; Wertzberger Decl. ¶ 79. In that paragraph Wertzberger also states, "Due to a certain level of mistrust and the fact that Mr Feerst still had not provided all of the documents he owed, including the UCC, the Security Agreement, and the personal guarantees, I recorded the meeting." Wertzberger Decl. ¶ 79.

[34] 6/24 Tr. at 118 (Menczer testifies that he does not understand how to distinguish a share transfer from a note and mortgage); 6/25 Tr. at 16 (Goldberger testifies that he does not know what loan documents are), 29 (Goldberger testifies that he did not know what a note meant). Feerst testified credibly, on the other hand, that Goldberger had been his client for over 30 years and that he did nothing that Goldberger did not direct. Goldberger himself noted that he had been in business "20, 30 years," 6/25 Tr. at 42, and had invested "about $21 million in Blue Beverage with Menczer.  Id. at 44.  Menczer appeared to be an equally experienced businessman. Nevertheless, each tried to blame the other or Feerst for their allegedly unknowing or naïve actions.  6/24 Tr. at 118 (Menczer testifies that the lawyer was responsible for the documents), 144 (Menczer blames Goldberger for "having a real loose mouth and I'm having problems with him)"; 6/25 Tr. at 22 (Goldberger testifies that Menczer "was the one dealing and handling and everything"), 31-33, 35 (Goldberger testifies that he did what Feerst told him except Feerst gave the note to Wertzberger on his own, although at another point (id. at 36-35) he states that it looks like his signature on the note but if he gave it to Feerst he did not look at it).

[35] The Court infers that by "security agreements" Wertzberger means the agreements granting liens on personal property of Blue Beverage, such as accounts receivable, that Feerst told Kranz on September 4, 2014 he would complete overnight but in fact never delivered.

[36] 6/24 Tr. at 137-138 (Menczer).

[37] Id. at 138 (Menczer).

said, 'you know what I'm signing it, I don't care. I'm signing it and that's it.'" Ex. J at 15.  Later,

on page 17, Wertzberger states, "What do you mean?  You signed the mortgage and you even

gave it to me.  All of the papers –" to which Menczer replies, "I didn't agree with it, but they

forced me -- you can ask Bentzy between 4 eyes." Id. at 17.

Then at pages 56-57 Goldberger states that Feerst  told him only the note was delivered,

not the mortgage, to which Wertzberger understandably responds, "It is very hard for me to

negotiate with two people who sit down at the table and when I walk out of the office with

papers which were given to me by their lawyer, and then he claims that his lawyer claims he

doesn't have it, like as if to say that we pulled a fast one, because his lawyer was the one who

gave it to me."  Id. at 57.  The following dialogue ensues:

Goldberger:  "The note."

Wertzberger:  "The note."

Goldberger:  "The note itself he did give you, yeah."

Wertzberger:  "Yeah."

Goldberger:  "He gave you a note but not the mortgage, he says.  A note he did give you

but not the mortgage papers."

Wertzberger:  "Ok, I'll show you the original mortgage papers."

Goldberger: "With mine and his signature?"

Wertzberger:  "Yes."

Goldberger:  "Ok, if you think that you have a mortgage -- you have a mortgage."

Wertzberger:  "All that I want is that the entire stack of papers, the security agreements,

the UCC1, the acknowledgements, the releases that you received the money, this will give me

the sanity that there is closure and I can be assured that you won't torture me anymore."

Id. at 57-58.

In addition, it is telling that when Kranz sent a demand letter on October 6, 2014,

neither Goldberger nor Menczer for themselves or on behalf of the Borrowers responded, until

they did so months later in this litigation, by asserting that their signatures had been forged,[38]

which would have been the natural reaction if they really believed it.

Lastly (and perhaps most importantly, although each of the foregoing would

independently support the signatures on the note and mortgage as genuine), when the

Borrowers implemented the confessions of judgment and Correction Mortgage scheme, 152

Broadway *acknowledged the validity of Plaintiff's earlier mortgage* in the Correction Mortgage.

JE 5.

Having been prepared by Feerst and others working for him at Goldberger's request,[39]

the Correction Mortgage is dated February 18, 2015, and Goldberger's signature on behalf of

152 Broadway, which was notarized by Goldberger's son and is not disputed.  It was recorded

with the Clerk of Rockland County, New York on February 23, 2015.  On the first page it states,

"This mortgage is a correction mortgage to correct the legal description of mortgage in 2014-

---

[38] 5/1 Tr. at  58 (Feerst testifies that he did not discuss forgery issue with Goldberger until 2018), 65, 89 (Feerst
testifies that he received but did not respond to October 6, 2014 Broadway Equity demand letter), 116-17
(Wertzberger); 6/24 Tr. at 138 (Menczer testifies that response to the demand letter was to file the Correction
Mortgage, which makes no mention of forgery); 6/25 Tr. at 28-36 (Goldberger).  While it is clear from Goldberger's
testimony that no response ensued to the demand letter alleging forgery, his testimony about whether he even
thought at the time the demand letter was received that the documents were forged is a mishmash of contrdictory
assertions, retractions and evasion. 6/25 Tr. at 28-36 (Goldberger).
[39] 6/24 Tr. (Feerst); 6/25 Tr. at 39-41 (Goldberger).

25287," that number being the identification number of Plaintiff's mortgage on the Property

earlier recorded with the Clerk of Rockland County and appearing at Ex. E1-3.  In addition,

Goldberger signed an affidavit under Section 255 of the New York State Tax Law on February

18, 2016, also notarized by his son, in which he stated that the Correction Mortgage "does not

create or secure any new or further lien, indebtedness or obligation other than the principal

indebtedness or obligation secured by or which under any contingency may be secured by the

recorded mortgage hereinabove first mentioned [i.e., Plaintiff's mortgage on the Property

earlier recorded at instrument number 2014-00025287]."  JE 6; 6/25 Tr. at 53-54.[40]

The evidence, including Menczer and Goldberger's admissions, therefore is

overwhelming that Plaintiff's note and mortgage were not forged but, rather, signed by them

on behalf of the Borrowers. Their protestations to the contrary at trial were transparently

false.[41]

---

[40] By so swearing, Goldberger saved 152 Broadway paying another mortgage recording tax under New York law, the tax previously paid on instrument number 2014-00025287 being $787,000.  JE 6; 6/25 Tr. at 58.  Perhaps not surprisingly, this is another document that Goldberger testified he signed without agreeing to simply because Feerst gave it to him, 6/25 Tr. at 54, 56-57, though, he said, "I know from now on, I learned a lesson." Id. at 60.

[41] It should be noted that although the Court finds such evidence overwhelming, Plaintiff's actual burden of proof was far lower.  Indeed, given the signatures on the face of the documents, although Plaintiff has the ultimate burden of proof, the initial burden of asserting sufficient facts to show forgery is on the party asserting it, here the Counterclaim Plaintiffs.  Bradford Trust Co. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc., 622 F. Supp. 208, 211 (S.D.N.Y. 1983) ("It is incumbent upon a party claiming the non-genuineness of a signature [on a negotiable instrument] to produce firsthand proof of the forgery.").  Mendelsohn v. A & C Hldg. Co. (In re Piazza), 181 B.R. 19, 24 (Bankr. E.D.N.Y. 1995); Arnav Indus., Inc. v. M.H.B. Hdgs., Inc., 46 Misc.3d 1224(A), 9 N.Y.S.3d 592 (Sup. Ct. NY Cty. 2014).  Moreover, where a document such as a mortgage is properly notarized, the presumption of its due execution cannot be rebutted "upon evidence of a doubtful character, such as the unsupported testimony of interested witnesses, nor upon a bare preponderance of evidence, but only upon proof so clear and convincing as tantamount to a moral certainty."  In re Cocoa Servs., LLC, 2018 Bankr. LEXIS 1132, n. 22 (Bankr. S.D.N.Y. April 13, 2018) (internal citations and quotations omitted); Kanterakis v. Minos Realty I, LLC, 151 A.D.3d 950, 952, 55 N.Y.S.3d 452 (3d Dep't 2017), leave to appeal den., 30 N.Y.3d 913 (2018); Son Fong Lum v. Antonelli, 102 A.D.2d 258, 260-61, 476 N.Y.S.2d 921 (2d Dep't 1984), aff'd 64 N.Y.2d 1158 (1985).  That has not happened here; instead, clear and convincing proof established the signatures were genuine.

17

In actuality, the Correction Mortgage's statement that it was intended "*to correct the legal description*" (emphasis added) in the originally filed mortgage was also false, at least by implication, because in addition to including a complete description of the Property that was lacking in the original, signed mortgage (as discussed below, the only legitimate aspect of the Correction Mortgage), the document contains several provisions that dramatically impair Plaintiff's rights to which Plaintiff did not agree.  Thus Paragraph 16 of the Correction Mortgage reduces the default interest rate from 20 percent in the original document to 10 percent, and Paragraph 19 includes an interest waiver for over two years, waives the appointment of a receiver, waives a deficiency judgment, and subordinates Broadway Equity's mortgage to future mortgages recorded on the Property to the extent of $13 million.  Goldberger admitted the Plaintiff never agreed to these terms,[42] and of course without such an agreement they could not be binding.  Nevertheless, the Plaintiff would have to take legal action to have them declared not binding.  Goldberger also caused the Correction Mortgage to be recorded approximately two months after causing the recordation of the confessions of judgment and in response to the filing of Plaintiff's mortgage.[43] He and Menczer also acknowledged that the confessions of judgment in turn were backdated by several years and that they represent no debt that was ever documented or attempted to be enforced until their recordation in December 2014, after Plaintiff had made demand on the note and recorded its mortgage,[44] all of which would require Plaintiff to take legal action to invalidate the elevation of the

---

[42] 6/25 Tr. at 49-52, 62-67 (Goldberger).
[43] Id. at. 72.
[44] 6/24 Tr. at 152-63 (Menczer); 6/25 Tr. at 62-68, 70-73 (Goldberger).  Goldberger testified that he understood *these* documents because his lawyer was able to explain them to him.  6/25 Tr. at 63-64.  Goldberg's explanation for the backdating by several years, which was the same for each confessions of judgment:  "They made a mistake."  6/25 Tr. at 68.

18

confessions of judgment.  The entire scheme reeked of fraud whereby Goldberger and Menczer

sought to prefer their relatives over Broadway Equity's note and mortgage that they had

previously signed, not to mention being a stark abuse of their fiduciary duties to the Borrowers

and the Borrowers' legitimate creditors by creating and then purporting to perfect a lien to

secure fictitious debt.

**Other Defenses to Foreclosure.**   Having established that it is the holder of a validly

executed note and mortgage -- and there being no dispute that the Borrowers are in default

under the note, having failed to make any payments -- Plaintiff would normally be entitled to a

foreclosure judgment on the Property.  <u>Gustavia Home, LLC v. Rutty</u>, 785 Fed. Appx. 11, at *14

(2d Cir. Sept. 16, 2019) ("In a foreclosure action, under New York law, a plaintiff establishes its

prima facie entitlement to summary judgment by producing evidence of the mortgage, note

and defendant's default.") (citations omitted); <u>Wells Fargo Bank, N.A. v. Ullah</u>, 2015 U.S. Dist.

LEXIS 7715, at *10 (S.D.N.Y. June 15, 2015).   The Counterclaim Plaintiffs assert two remaining

defenses, however, based on (a) the alleged improper notarization of the mortgage and (b) the

mortgage's failure to describe the Property.[45]

**Improper Notarization**.  As to the first issue, the Counterclaim Plaintiffs assert as a

defense and in support of their counterclaims that (a) Wolcowitz was an "interested party"

under New York's Notary Public License Law, Department of State – Division of Licensing

Services (www.dos.ny.gov), (b) the mortgage therefore was not properly notarized, and, thus, (c)

---

[45] At trial the Counterclaim Plaintiffs also pointed out other changes from the signed mortgage to the version
recorded with the Rockland County Clerk, which appears at JE 1, Ex. C -- that the mortgage's date was changed to
the actual date of execution, that the notary box was slightly altered, and that a stamp states "premises improved
by:  [x] other than 1-6 family dwelling" -- but have not argued that any of these alterations have any legal
significance, and they do not.

"the Mortgage should be deemed void and unenforceable."  Defendants' Post Trial

Memorandum of Law at 4.[46]  However, they misconstrue the facts as applied to the "interested

party" prohibition; under the Notary Public License Law's terms and as interpreted by the

courts, Wolcowitz was not an "interested party" and therefore properly acted as a notary.

Under the Notary Public License Law, a notary must be "directly and pecuniarily

interested in the transaction" to be incapacitated from acting as a notary in that case.[47]

 Baram v. Person, 153 A.D.3d 1183, 60 N.Y.S.3d 167 (1st Dep't 2017) (notary not "interested"

where "did not have a direct, pecuniary interest in the malpractice action"); Alfieri v. Guild

Times Pension Plan, 446 F. Supp. 2d 99, 111-12 (E.D.N.Y. 2006) (notary who was a co-employee

of decedent, an employee of the sponsor of the pension plan defendant and a participant in

that plan was not "interested" because he had only an indirect interest in plaintiff's pension

claim); In re Felicetti, 1998 NYLJ LEXIS 6670, at *3-4 (Sur. Ct. Nassau Cty. Jan. 22, 1998) ("[A]

notary is not disqualified merely by reason of his relationship [grandson] to one of the parties.")

(citations omitted).

Here, the mortgage is between 152 Broadway and Broadway Equity, not 152 Broadway

and Wolcowitz.  Wolcowitz was not a party to the transaction, nor was he an interest holder in

Broadway Equity, nor even related to an interest holder in Broadway Equity.  He had only an

indirect interest in the transaction, in that Broadway Equity's receipt of the mortgage might

---

[46] Of course, they also assert that Wolcowitz did not witness Goldberger sign the mortgage and thus that his subsequent notarization was false, but the Court has already found that he did in fact witness the mortgage and note being signed.  If a notary actually witnessed the signatures of people he knew or who identified themselves as such, it does not matter that his notarial acknowledgement occurs, as here, later.  Liberty Pointe Bank v. 75 E. 125th, LLC, 2013 N.Y. Misc. LEXIS 702, at *17-18 (Sup. Ct. N.Y. Cty. Feb. 14, 2013).
[47] Defendants' Post Trial Memorandum of Law misquotes this language, at 4, as "directly or pecuniarily interested in the transaction." (emphasis added).

induce Wertzberger and the interest holders in Broadway Equity to want to continue to support

Blue Beverage's business going forward, and he and Wertzberger (with whom he had long been

associated, including as a party to the Commitment to Sell Contract) had long desired to secure

the financing provided by the people with whom Wertzberger was related and the entities in

which Wertzberger had an interest who were Broadway Equity's interest holders.[48]  If

Wolcowitz were disabled as an "interested party" from notarizing documents in such

circumstances, countless notarizations by employees of law firms on behalf of their clients

would also be invalid.

Moreover, neither in its Post-Trial Memorandum nor its Memorandum of Law in Reply

to Plaintiff's Post Trial Submission does 152 Broadway cite any authority for the proposition

that the mortgage should be deemed void and unenforceable as to it if not properly notarized,

and the applicable law as applied to these facts is to the contrary.

That an acknowledgment or notarization may have been improperly taken -- or even not

taken at all -- is insufficient to set aside a conveyance of land or affect its validity *as to the*

*grantor*.  Strough v. Wilder, 119 N.Y. 530, 535 (1890);  Son Fong Lum v. Antonelli, 102 A.D.2d

258, 262, 476 N.Y.S.2d 921 (2d Dep't 1984), aff'd 64 N.Y.2d 1158 (1985); Matter of Offernan,

---

[48] 5/1 Tr. at 162 where Wolcowitz explained why it was important for him to be at the September 4, 2014 closing: "I worked at our plant for two years and we were going back and forth at that point to try to get security.  And we were being pushed around for about a – at that point it was already for over a month.  I had obligations to myself, for Mr. Wertzberger, for the investors, for the – sorry, not investors, for the lenders – to be there and make sure to see this through.  Now, I remember the earlier times, if I wasn't there when they had questions about the plant, they would come back to us and say, 'Oh I still need information on this, and I still need information on that.' Joe used to call me or used to say, 'Okay, so get from Jack [Wolcowitz's non-Hebrew name] information.'  If I was there, Joe was there, everybody is there, I knew there was no reason this is not going to get done.  Any information, or any information they would need, is going to be a (indiscernible) right away." Id.  Although this is the primary, if not sole, basis for the Counterclaim Plaintiffs' allegation that Wolcowitz was an "interested party" under the Notary Public License Law, it does not describe the direct pecuniary relationship required by the statute and case law.

172 A.D.2d 838, 569 N.Y.S.2d 104 (2d Dep't 1991); <u>Drt Constr. Co. v. Bh Assocs.</u>, 269 A.D.2d 783,

783-84, 702 N.Y.S.2d 738 (4th Dep't 2001); <u>Scott v. Doyle</u>, 12 Misc.3d 1163(A) (Sup. Ct. Qns. Cty

2006); 1 Bergman on New York Mortgage Foreclosures § 1.20 (2020).  A proven, unrecorded

mortgage is still enforceable against the owner/mortgagor.  <u>Berman v. Nassau County Dept. of

Social Services</u>, 1111 Misc.2d 739, 741, 444 N.Y.S.2d 974 (Sup. Ct. Nassau Cty. 1980); <u>Sobel v.

Wolf</u>, 1961 N.Y. Misc. LEXIS 3622, 216 N.Y.S.2d 132, 133 (Sup. Ct. West. Cty. 1961).

Three consequences do in fact follow from an ineffective mortgage notarization:  the

strong presumption of execution discussed at footnote 41, does not apply; under NY CLS Real

Property Law § 291, the county clerk should not accept the mortgage for recordation, and if not

recorded it is void as to subsequent transferees;[49] and, pursuant to NY CLS Real Property Law §

329, the property owner is authorized to pursue an action to have the improperly recorded

instrument cancelled of record.[50]  As discussed above, though, the Court has not relied on the

presumption of execution resulting from notarization, although, as also discussed above, it

could do so based on its determination that Wolcowitz witnessed the signing and was not an

"interested party."  Of course the Rockland County Clerk did accept the mortgage for

recordation, but under the authorities cited above and based on the Court's finding that the

mortgage and note were indeed signed on behalf of the Borrowers, the mortgage would be

enforceable against 152 Broadway in any event even if it were not recorded, the remedy under

---

[49] NY CLS Real Property Law § 291 states in relevant part, "A conveyance of real property, within the state, on being duly acknowledged by the person executing same, or proved as required by this chapter, . . . may be recorded in the office of the clerk of the county where such real property is situated. . . . Every such conveyance not so recorded is void as against any person who subsequently purchases or acquires by exchange or contracts to purchase or acquire by exchange, the same real property or any portion thereof. . . ."

[50] NYS CLS Real Property Law § 329 states in relevant part, "An owner of real property . . . may maintain an action to have any recorded instrument in writing relating to such real property . . . declared void or invalid, or to have the same canceled of record as to said real property. . . ."

N.Y. Real Property Law § 329 (which the Counterclaim Plaintiffs have not invoked) being only

cancellation "as of record."[51]  Nor would the Confession of Judgment Creditors benefit from

cancellation of the mortgage as of record under NY CLS Real Property Law § 329 in the light of

the Court's determination that the entry into and recordation of their confessions of judgment

was a sham and a fraud.

**The Property Description**.  The Counterclaim Plaintiffs also allege as a defense and in

support of a counterclaim that the signed mortgage does not contain a sufficient description of

the Property and therefore is of no force or effect.  They are correct in the first part of their

argument:  the mortgage actually signed by Goldberger does not contain a sufficient Property

description.  On page 1, it states only that it covers all the property "in the County of Rockland,

State of New York, more particularly described in Schedule 'A' which is attached hereto and

made a part hereof," and, unfortunately for Broadway Equity (although it appears the Property

was 152 Broadway's only interest in real property and there is no doubt that the parties

intended the mortgage to cover the Property), Schedule "A" was not attached.  Ex. Q.  Schedule

"A" was attached, by someone working for Wertzberger or Kranz,[52] only when the mortgage

was recorded with the Rockland County Clerk.  See JE 1, Ex. C.

Plaintiff notes that the last page of the mortgage that Goldberger signed does contain a

Property description, by section, block, lot and county, that would normally suffice to identify it.

Ex. Q.  However, that description appears below the signature line and, therefore, is not

---

[51] See Plotch v. Wells Fargo Bank, N.A., 2008 U.S. Dist. LEXIS 129145, at *7-8 (E.D.N.Y. Aug. 1, 2018) (owner may invalidate mortgage as to it only where there is a fundamental defect with the underlying record involving the actual parties). See also authorities cited at 21-22, above.
[52] 5/1 Tr. at 29-30 (Kranz), 82, 95-96 (Wertzberger)

included in the "subscribed' document for purposes of New York's Statute of Frauds, NY Gen.

Obl. L. § 5-703[1].  The rule goes back at least to 1851.  James v. Patten, 6 N.Y. 9 (1851)

("subscribed" means "at the end of the instrument"); Maurice v. Maurice, 131 A.D.3d 454, 456,

15 N.Y.S.3d 133 (2d Dep't 2015); Steinberg v Universal Machinenfabrik GMBH, 24 A.D.2d 886,

887, 264 N.Y.S.2d. 757 (2d Dep't 1965) ("The subscription which the statute [of frauds]

demands is a writing at the end of the memorandum.").

Without more, the mortgage therefore would not have a sufficient description of the

Property.  Under New York's Statute of Frauds, the writing "must contain expressly or by

reasonable implication all of the material terms of the agreement."  Morris Cohon & Co. v.

Russell, 23 N.Y.2d 569, 575 (1969); Cobble Hill Nursing Home v. Henry & Warren Corp., 74

N.Y.2d 475, 482 (1989), cert. denied, 498 U.S. 816 (1990).  For a conveyance of real property,

such as a mortgage, the property description is such a term.  Maurice v. Maurice, 131 A.D.2d at

456; Rekis v. Lake Minnewaska Mountain Houses, Inc., 170 A.D.2d 124, 127, 573 N.Y.S.2d 331

(3d Dep't 1991); Adam Plotch LLC v. World Sav. Bank, FSB, 2018 U.S. Dist. LEXIS 3163, at *12-13

(E.D.N.Y. Jan. 8, 2018); DLJ Mortg. Capital Inc. v. Cross Is. Plaza, Inc. (In re Cross Is. Plaza, Inc.),

2015 Bankr. LEXIS 2543, at *31-32 (Bankr. E.D.N.Y. July 20, 2015).

There is more, however, to render the mortgage enforceable under the Statute of

Frauds:  152 Broadway's own signed statement in the Correction Mortgage, which was drafted

and filed with the Rockland County Clerk with the same Schedule "A" accurately describing the

Property as the originally filed mortgage, and which states that "This mortgage is a correction

mortgage to correct the legal description of mortgage in 2014-25287 [i.e., the instrument

number of Plaintiff's originally filed mortgage]." JE 1, Ex. D (emphasis added). Thus, upon the

filing of the Correction Mortgage, the parties agreed in a writing concededly executed by

Goldberger on behalf of 152 Broadway, the party to be charged therewith, as to the Property's

description.  "The statute of frauds does not require the memorandum to be one document.  It

may be pieced together out of separate writings connected with one another either expressly

or by internal evidence of subject matter and occasion.  Where each of the separate writings

has been subscribed by the party to be charged, little if any difficulty is encountered." <u>Crabtree</u>

<u>v. Elizabeth Arden Sales Corp.</u>, 305 N.Y. 48, 54 (1953) (quoting <u>Marks v. Cowdin</u>, 226 N.Y. 138,

144-45 (1919)); <u>see</u> <u>also</u> <u>Roulley v. Inex Co.</u>, 677 F.2d 14, 15 (2d Cir. 1982); <u>Bruce Realty Co. v.</u>

<u>Berger</u>, 327 F. Supp. 507, 510-11 (S.D.N.Y. 1971) (subsequent signed writing that acknowledges

previously signed agreement and fills in missing crucial term satisfies New York statute of

frauds).

   **<u>The Notarial Misconduct Claim.</u>**  For the reasons discussed above, Wolcowitz properly

notarized the mortgage; consequently, the Counterclaim Plaintiffs have not carried their

burden with respect to their notarial misconduct claim against him.  <u>Amidel v. New York State</u>

<u>Chiropractic Ass'n</u>, 160 A.D.2d 279, 282, 533 N.Y.S.2d 713 (1st Dep't 1990), <u>aff'd</u> 77 N.Y.2d 890

(1991).

   Moreover, separate and apart from to the Court's conclusion that the mortgage was

properly notarized, the notarial misconduct claim fails because the Counterclaim Plaintiffs have

not shown the alleged misconduct proximately caused 152 Broadway any injury.  <u>Wells Fargo</u>

<u>Bank, N.A. v. Sherwood</u>, 82 A.D.2d 758 758-59, 917 N.Y.S.2d 910 (2d Dep't 2011) (NY Executive

Law § 135 requires showing of damages); <u>see</u> <u>also</u> <u>Rastelli v. Glassman</u>, 231 A.D.2d 507, 508,

647 N.Y.S.2d 253 (2d Dep't 1995); <u>Jennings-Purnell v. Donner</u>, 2016 N.Y Misc. LEXIS 2993, at

*29-30 (Sup. Ct. N.Y. Cty. Aug. 10, 2016; Saleh Holdings Grp., Inc. v. Chernov, 30 Misc. 3d

1220[A], 924 N.Y.S.2d 312 (Sup. Ct. N.Y. Cty. 2011).  Here, the Counterclaim Plaintiffs have tried

to use the alleged notarial misconduct as a sword to avoid Plaintiff's mortgage, and, as

discussed above, having determined *without* imposing on the Counterclaim Plaintiffs the heavy

burden of proof to establish the forgery of a properly notarized document that it is clear that

Goldberger and Menzcer signed the documents, the mortgage is enforceable as against 152

Broadway, which, consequently, cannot be damaged.[53]

### Preservation of Potential Claims under 11 U.S.C. §§ 544(b) and 510(c).

Claims to avoid fraudulent transfers, equitably subordinate debts and compel the

transfer of liens under 11 U.S.C. §§ 544(b) and 510(c) are remedies for the ultimate benefit of

creditors.  When this litigation commenced, the Borrowers had not filed their bankruptcy cases;

nor were unsecured creditors named as defendants.  Accordingly, claims could not have been

asserted under such sections of the Bankruptcy Code and unsecured creditors' only ability to

assert a claim under New York's fraudulent transfer statutes, incorporated by section 544(b),

would have been in a separate action, which has not taken place.

Upon the filing of their bankruptcy cases, the Borrowers, as debtors in possession,

became fiduciaries for their estates and creditors with the standing to assert such claims, but

such standing can be transferred when, among other reasons, a debtor in possession is shown

to have unjustifiably failed to bring suit or otherwise abused its fiduciary duty with respect to

---

[53] Plaintiff argues that the claim is a red herring for another reason:  Feerst witnessed the mortgage.  The Court has in fact found that Feerst signed the mortgage under the phrase "IN WITNESS WHEREOF, this mortgage has been duly executed by the mortgagor."  Ex. Q JWertz00553.  However, Feerst is not an "officer" under NY CLS Real Property Law § 298 authorized to take acknowledgments of conveyances of real property and in any event did not comply with all the requirements of NY CLS Real Property Law §§ 304 or 309 with respect to subscribing witnesses.

estate claims.  In re STN Enterprises, 779 F.2d 901, 904 (2d Cir. 1985).  Whether Goldberger and

Menczer were proper fiduciaries for the Borrowers or instead acting chiefly for themselves and

their relatives long has been an issue in this proceeding; indeed, at the start of the trial, Plaintiff

sought to disqualify one of the firms representing Goldberger and Menczer on the basis of such

conflicts of interest because it also had a pending application to represent the Borrowers in

their chapter 11 cases.[54]  The Court believes that it indicated at the start of the trial, as well as

during the final pre-trial conference, that no fraudulent transfer or equitable subordination

issues should be determined in this context.  The trial confirmed Goldberger and Menczer's

conflicts of interest.  Thus, this Memorandum of Decision and the resulting judgment will not

bind a trustee, an official creditors committee or legitimate third-party unsecured creditors

seeking standing in the Borrowers' chapter 11 cases to pursue claims against the Plaintiff under

11 U.S.C. §§ 544(b)or 510(c) for the benefit of holders of allowed claims.  Because Goldberger,

Menczer and the Confession of Judgment Creditors did fully participate in the trial, however,

and, moreover, because it does not appear that any of them have legitimate claims against the

Borrowers, they are precluded from benefitting from any such actions, if ever commenced and

successfully litigated.[55]

## Conclusion

        For the foregoing reasons, Plaintiff is entitled to a judgment under the note and

mortgage and of foreclosure on the Property.  Plaintiff also is entitled to a judgment directing

---

[54] 5/1 Tr. at 7-9.  The Court denied Plaintiff's request, noting that the issue of counsel's retention by the Borrowers would be decided in the Borrowers' chapter 11 cases.  Id. at 9.
[55] The Court has not determined whether such causes of action exist or are worth the cost of pursuit; any motion for standing to bring such causes of action will be decided on its merits.

that following entry of the judgment of foreclosure on its mortgage, the Correction Mortgage

shall be declared of no force or effect and removed from the county records.  These judgments

shall be without prejudice, however, to the right of a trustee, official creditors committee or

any creditor with an allowed claim in the Borrowers' chapter 11 cases to seek to pursue claims

under 11 U.S.C. §§ 541(b) and 510(c) based on the Borrowers' grant of the note and mortgage

to Plaintiff, or otherwise to avoid the mortgage; provided, that neither the individual

Counterclaim Plaintiffs nor the Confession of Judgment Creditors shall in any way benefit from

any such cause of action.

Plaintiff also is entitled to a declaration that the judgment liens based on the filing of the

confessions of judgment are void because the underlying confessions of judgment were a sham

and their filing with the Rockland County Clerk was fraudulent.[56]  Further, Plaintiff is entitled to

judgment on the merits on its claim that by orchestrating the entry into and filing of the

confessions of judgment and the Correction Mortgage, the Borrowers, Goldberger and the

Confession of Judgment Creditors are liable to Plaintiff for damages proximately caused by such

wrongful and fraudulent actions.  Such damages and the allocation thereof among Goldberger

and the Confession of Judgment Creditors will need to be decided by further proceedings in this

Court on notice to such parties.

All of the Counterclaim Plaintiffs' counterclaims should be dismissed based on their

failure of proof.

---

[56] If Goldberger and Menczer remain in control of the Borrowers, the United States Trustee should consider promptly filing a motion in the Borrowers' chapter 11 cases for the appointment of a chapter 11 trustee.

Plaintiff shall submit a proposed judgment to the Court consistent with this

Memorandum of Decision, copying counsel for the Counterclaim Plaintiffs and the Confession

of Judgment Creditors on such submission.

Dated:  White Plains, New York
        May 12, 2020

/s/ Robert D. Drain
United States Bankruptcy Judge